75 F.3d 1311
 96 Cal. Daily Op. Serv. 839, 96 Daily Journal
D.A.R. 1369
Tomas ARMENDARIZ; Rosa C. Armendariz; Harry Julian Brown,
Jr.; Lance A. Bukouskis, et al., Plaintiffs-Appellees,
v.
James F. PENMAN; W.R. Holcomb; David M. Stachowski; Cecil
Dillard; Kenneth J. Henderson, et al.,
Defendants-Appellants.
Tomas ARMENDARIZ; Rosa C. Armendariz; Harry Julian Brown,
Jr.; Lance A. Bukouskis, et al., Plaintiffs-Appellees,
v.
James F. PENMAN; W.R. Holcomb; David M. Stachowski; Cecil
Dillard; Kenneth J. Henderson, et al., Defendants,
and
Al Boughey; Larry Reed, Defendants-Appellants.
Tomas ARMENDARIZ; Rosa C. Armendariz, Plaintiffs-Appellees,
v.
James F. PENMAN, Defendant-Appellant.
 Nos. 93-55393, 93-55587 and 93-55748.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted June 7, 1994.
Decided Aug. 1, 1994.
Order Granting Rehearing En Banc
November 25, 1994.
 Argued and Submitted Jan. 19, 1995.
Decided Feb. 7, 1996.
 
 Christopher D. Lockwood, MacLachlan, Burford & Arias, San Bernardino, California, and Cynthia Ludvigsen, San Bernardino, California, for defendants-appellants.
 Darlene Fischer Phillips, Hill, Farrer & Burrill, Los Angeles, California, for plaintiffs-appellees.
 Appeals from the United States District Court for the Central District of California; Consuelo B. Marshall, District Judge, Presiding.
 Before: WALLACE, Chief Judge, BROWNING, SCHROEDER, FLETCHER, POOLE, BEEZER, WIGGINS, KOZINSKI, JOHN T. NOONAN, Jr., T.G. NELSON, and MICHAEL DALY HAWKINS, Circuit Judges.
 Opinion by Judge FLETCHER; Partial Concurrence and Partial Dissent by Chief Judge WALLACE; Partial Concurrence and Partial Dissent by Judge SCHROEDER; Partial Concurrence by Judge BEEZER.
 FLETCHER, Circuit Judge:
 
 
 1
 This is an interlocutory appeal from the denial of summary judgment to city employees who claim that they are entitled to qualified immunity. The recitation of events below necessarily follows the allegations of the parties--nothing has been put to the crucible of trial.
 
 
 2
 Several years ago the City of San Bernardino embarked on a program of vigorously enforcing its housing code. The City boarded up low-income housing units, evicting tenants among whom were suspected gang members, drug dealers and other criminals, and revoking the property owners' business licenses and certificates of occupancy. We consider whether the city officials responsible for the administration of this program can be sued for depriving the property owners of substantive due process or equal protection.
 
 
 3
 * The plaintiffs are owners and former owners of low-income housing units in the Arden-Guthrie section of the City of San Bernardino ("the City"), an area of high crime and predominantly low-income housing. In 1991, the City conducted a series of housing code enforcement sweeps in Arden-Guthrie. The sweeps were massive undertakings, with city officials, police, firefighters, and housing code inspectors descending on the area to inspect dozens of pre-selected buildings. All told, the City summarily closed 95 buildings over a six-month period, evicting the tenants and driving them to other parts of the city.
 
 
 4
 The City didn't notify affected property owners in advance that the sweeps would occur, didn't inform owners at the time of the closures why their buildings were being shut down, and didn't identify the specific code violations they found until well after the sweeps had been completed and the buildings closed. In some cases, as many as six weeks passed before the owners were informed why their properties had been closed, leaving them without guidance as to what they needed to do to reopen units or how they could challenge the City's action. When the closure notices did arrive, they either were worded so vaguely as to be unhelpful or cited seemingly minor, easily repairable violations. For example, some notices cited "general dilapidation" as a reason for the closures. Others cited more specific, but no more compelling, reasons, such as holes in firewalls, which could be patched in a matter of hours, or air conditioning units in the windows, which could be removed in minutes.[1] In conjunction with these evictions, the City revoked the plaintiffs' business licenses and certificates of occupancy, also without notice or an opportunity to be heard.
 
 
 5
 Coupled with other actions taken by the City, the closures placed property owners in a precarious position. If they wanted to reopen their properties, the plaintiffs had to obtain costly permits for repairs and run a gauntlet of city inspections conducted at the property owners' expense. Because the City had evicted the plaintiffs' tenants, the plaintiffs were earning no income from the properties to fund repairs, and many had so leveraged their properties that they could not qualify for city or federal rehabilitation loans, which have minimum requirements for an equity interest. Several plaintiffs allege that the City, as part of an effort to force them out of business or into line with the City's plan to rid the area of undesirable tenants, deliberately withheld loan money in order to hinder the plaintiffs' efforts to make repairs.[2] The City also shut off power to the closed buildings. With the area left largely deserted by the relocation of tenants, vagrancy and vandalism became a serious problem. Departing tenants trashed their apartments in retaliation for being moved, and owners attempting to bring their buildings up to code often found their repairs wrecked by vandals before city inspectors arrived.
 
 
 6
 For all of these reasons, the plaintiffs feared that they would be unable to obtain new certificates of occupancy in a timely fashion. The timing of these certificates was particularly important. The owners' four-plexes were tolerated in an area zoned for two units per lot only because they were preexisting non-conforming uses. Under the City's interpretation of its Municipal Code and General Plan, the properties would lose that status if they remained vacant for more than 180 days.
 
 
 7
 In short, the sweeps took a substantial toll on the plaintiffs. To justify its summary closure of the plaintiffs' buildings, the City relied on its powers under the San Bernardino Municipal Code, which vests "the building official or his representative [with] summary power to secure from entry any structure which in his discretion he determines to be immediately dangerous or hazardous, or in any other manner injurious to public health or safety," City of San Bernardino, Municipal Code (SBMC), ch. 15.28.140, and permits the City, once it determines that a building is sufficiently dangerous, to "require the building ... to be vacated forthwith and not reoccupied until the required repairs and improvements are completed," SBMC, ch. 15.28.030.
 
 
 8
 Although the ostensible purpose of the City's code enforcement activity was the reduction of urban blight, the plaintiffs allege that city officials conducted these emergency sweeps for one or both of two pretextual motives. One alleged purpose of the sweeps was to force tenants with criminal records or suspected gang affiliations or both to relocate outside the City. The sweeps were billed as a "carrot and stick" approach to cleaning up Arden-Guthrie: If owners took on the mantle of law enforcement and evicted unwanted tenants, the City would provide rehabilitation loans and other assistance (the carrot); if owners did not cooperate, their buildings would be closed in the sweeps and their tenants would be evicted by the City (the stick). That model citizens might also be uprooted as a result of the program, or that some property owners might not be able to weather the storm of city inspections without the benefit of income from their properties, were unfortunate but necessary consequences of the plan. The plaintiffs also allege that city officials conducted the sweeps to enable a commercial developer to acquire contiguous property in Arden-Guthrie on the cheap, bulldoze the low-income housing units, and replace them with a planned shopping center. According to the plaintiffs, the City effectuated these purposes by "faking" the existence of serious housing code violations purportedly discovered on the plaintiffs' properties during the sweeps in order to invoke the City building official's emergency powers to evict the plaintiffs' tenants and revoke the plaintiffs' business licenses and certificates of occupancy.
 
 
 9
 The owners filed this lawsuit under 42 U.S.C. § 1983 and the Fair Housing Act, 42 U.S.C. § 3601 et seq., stating the following four claims:
 
 
 10
 1) that closure of their property without pre-deprivation notice, a hearing, or exigent circumstances, and without adequate post-deprivation relief, violated their right to procedural due process under the Fourteenth Amendment;
 
 
 11
 2) that the city's invocation of its emergency powers to close down their properties when no real emergency existed, along with other actions by the city, including specifically the decision to deny rehabilitation loans to several of the owners whose properties were closed, was arbitrary and capricious, and violated their Fourteenth Amendment right to substantive due process;
 
 
 12
 3) that the city's decision to close down plaintiffs' properties violated the equal protection clause of the Fourteenth Amendment;
 
 
 13
 4) that the city's decision to focus the sweeps on Arden-Guthrie had a disparate impact on the minority community of San Bernardino in violation of the Fair Housing Act.
 
 
 14
 The complaint originally named dozens of city officials, but most proved to be immune from suit for one reason or another and were dropped from the case. Only six defendants remain: William Holcomb, the City's Mayor; James Penman, the City Attorney; Al Boughey and Larry Reed, two successive Directors of Planning and Building Services; Kenneth Henderson, Director of the city's Redevelopment Agency; and Nester Nazario, a loan officer at the Redevelopment Agency.[3]
 
 
 15
 These defendants filed motions for summary judgment, claiming they were protected by qualified immunity because their actions did not violate any clearly established federal constitutional or statutory rights. They also claimed that they were entitled to summary judgment because the plaintiffs had not created a genuine issue of material fact as to whether they directed, organized, or otherwise participated in the code enforcement sweeps.
 
 
 16
 The district court denied the motions, both as to qualified immunity and liability, and the defendants filed this interlocutory appeal. See Mitchell v. Forsyth, 472 U.S. 511, 530, 105 S.Ct. 2806, 2817, 86 L.Ed.2d 411 (1985) (denial of qualified immunity is immediately appealable under the collateral order doctrine). A three-judge panel of our court affirmed the district court's denial of the defendants' request for qualified immunity on the plaintiffs' procedural due process claim, but reversed the district court's holding that the defendants were not entitled to qualified immunity on the plaintiffs' equal protection, substantive due process, and Fair Housing Act claims. One panel member dissented from the holding that the defendants were entitled to qualified immunity on the substantive due process claim. Armendariz v. Penman, 31 F.3d 860 (9th Cir.1994). The panel also held that the plaintiffs had not created a genuine issue of fact as to whether defendants Holcomb and Boughey played a role in the alleged conduct and, therefore, reversed the district court's denial of these defendants' motions for summary judgment. Id. at 870-71. Thus, the majority of the panel concluded that "[t]he defendants have qualified immunity as to all claims, except the procedural due process claims against defendants Larry Reed and James Penman". Armendariz, 31 F.3d at 863; but see id. at 871-72 (Trott, J., dissenting as to substantive due process).
 
 
 17
 We do not revisit the panel's rulings that the "plaintiffs have stated a claim for procedural due process violations under 42 U.S.C. § 1983 with regard to defendants Holcomb, Boughey, Reed, and Penman," id. at 866, or that those defendants were not entitled to qualified immunity from liability on that claim "because the law was clearly established at the time Holcomb, Penman, Reed and Boughey acted and it was unreasonable for them to believe that their actions were constitutional", id. at 869. Nor do we disturb the panel's dismissal of the Fair Housing Act claims, id. at 868-69. The portions of the panel's opinion dealing with these points remain in place as the law of the circuit. We vacate and reconsider those portions of the panel's opinion holding that defendants are entitled to qualified immunity from the plaintiffs' substantive due process and equal protection claims.
 
 
 18
 We conclude that the district court should have granted the defendants' motions for summary judgment on the plaintiffs' substantive due process claim. We affirm, however, the district court's denial of the defendants' motions for summary judgment on the plaintiffs' equal protection claim. Finally, we do not address issues relating to whether the pretrial record demonstrates genuine issues of material fact because such fact-based inquiries are not within the scope of an interlocutory appeal from the denial of qualified immunity. We vacate those portions of the panel opinion that deal with those issues and dismiss the appeal as to such issues.
 
 II
 
 19
 We start by determining the scope of our jurisdiction over this interlocutory appeal. We have jurisdiction to hear appeals only from "final decisions" of the district court. 28 U.S.C. § 1291. Section 1291 is borne out of recognition that piecemeal litigation increases trial costs, causes delays in the litigation, and risks the creation of unnecessary appellate work by presenting issues for review which could have been avoided entirely if trial had proceeded. See generally Firestone Tire & Rubber Co. v. Risjord, 449 U.S. 368, 374, 101 S.Ct. 669, 673, 66 L.Ed.2d 571 (1981).
 
 
 20
 Of course, the general rule against interlocutory appeals has its exceptions. Under the "collateral order doctrine," an otherwise unappealable order is considered "final" and therefore appropriate for immediate review if it conclusively determines the disputed question, resolves an important issue completely separate from the merits, and would be effectively unreviewable on appeal from a final judgment. Coopers & Lybrand v. Livesay, 437 U.S. 463, 468, 98 S.Ct. 2454, 2457, 57 L.Ed.2d 351 (1978); see Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 546, 69 S.Ct. 1221, 1225, 93 L.Ed. 1528 (1949).
 
 
 21
 The denial of a city official's motion for summary judgment based on qualified immunity is immediately appealable as a collateral order. Mitchell, 472 U.S. at 528, 105 S.Ct. at 2816. However, determining the scope of such an interlocutory appeal has often proved difficult for the courts. We must be cautious not to expand the Mitchell exception beyond its intended scope. See Swint v. Chambers County Comm'n, --- U.S. ----, ----, 115 S.Ct. 1203, 1211, 131 L.Ed.2d 60 (1995) (courts must not "encourage parties to parlay Cohen-type collateral orders into multi-issue interlocutory appeal tickets"). "An ordinary summary judgment motion ... is not automatically transformed into a qualified immunity claim merely because defendants are federal officials." Velasquez v. Senko, 813 F.2d 1509, 1511 (9th Cir.1987); see also Todd v. United States, 849 F.2d 365, 368 (9th Cir.1988) ("The Supreme Court's grant of appellate jurisdiction under Mitchell is narrow.").
 
 
 22
 The defendants assert that they are entitled to qualified immunity because, even if the facts alleged by the plaintiffs are proven to be true, those facts do not support a claim of violation of clearly established law. This basis for the defendants' appeal falls within the heart of Mitchell, and we have jurisdiction to consider it here. Determining this purely legal issue does not require us to "consider the correctness of the plaintiff's version of the facts," but only "whether the legal norms allegedly violated by the defendant were clearly established at the time of the challenged actions." Mitchell, 472 U.S. at 528, 105 S.Ct. at 2816.
 
 
 23
 The defendants go further in this appeal, however. They argue that even if the relevant law was clearly established, they are entitled to summary judgment because the plaintiffs have failed to establish genuine issues of material fact for trial. Until recently, the question of whether we have jurisdiction to consider this argument would have been a difficult one due to conflicting statements within our own case law. Compare Burgess v. Pierce County, 918 F.2d 104, 106-07 (9th Cir.1990) (determining in interlocutory appeal from denial of qualified immunity whether the plaintiff had presented a genuine issue of fact as to whether defendants had engaged in alleged conduct) with Velasquez, 813 F.2d at 1511 (dismissing for lack of jurisdiction an interlocutory appeal from the denial of a claim of qualified immunity based on the defendants' claim that they did not participate in the alleged conduct). The Supreme Court's recent decision in Johnson v. Jones, --- U.S. ----, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995), simplifies our task considerably.
 
 
 24
 In Johnson, the Supreme Court held that Mitchell does not sanction review of a district court's order denying the defendant's motion for summary judgment on qualified immunity grounds when the basis for the defendant's motion is that the evidence in the pretrial record is insufficient to create a genuine issue of fact for trial. --- U.S. at ----, 115 S.Ct. at 2156-59. Thus, an appellate court lacks jurisdiction in an interlocutory appeal to consider the question of whether the plaintiff has created a genuine issue of fact regarding whether particular defendants participated personally in the alleged wrongful conduct. Id.
 
 
 25
 Three lines of reasoning supported the Supreme Court's decision in Johnson. First, Mitchell itself emphasized repeatedly that an appeal from the denial of qualified immunity does not require the appellate court to consider the correctness of the plaintiff's version of the facts. Johnson, --- U.S. at ----, 115 S.Ct. at 2156. Second, the question of whether the plaintiff has created a genuine issue of material fact, even within the context of a motion for qualified immunity, cannot be said to be separate from the merits as required by the Cohen collateral order doctrine. Id. at ---- - ----, 115 S.Ct. at 2156-57. Finally, an appeal from an order finding a genuine issue of material fact implicates different institutional concerns than one from an order holding that the relevant law was clearly established: Appellate judges do not enjoy a special expertise over trial judges regarding such factual determinations, so interlocutory review in such cases would not bring the same "important error-correcting benefits," and review of such a fact-based order would require the appellate court to scour the pretrial record, increasing delay in the litigation, with a high likelihood that the court would have to engage in an identical review after final judgment. Id. at ---- - ----, 115 S.Ct. at 2157-58.
 
 
 26
 Johnson defines the scope of this appeal. Rather than undertake a cumbersome review of the pretrial record to determine the sufficiency of the plaintiffs' evidence, we "simply take, as given, the facts that the district court assumed when it denied summary judgment for [a] (purely legal) reason." Id. at ----, 115 S.Ct. at 2159. The district court's order denying the defendants' motion for summary judgment does not state explicitly which facts the court assumed as true. Accordingly, we undertake a review of the pretrial record only to the extent necessary "to determine what facts the district court, in the light most favorable to the nonmoving party, likely assumed." Id.
 
 
 27
 It is clear from Johnson, then, that we have jurisdiction to review the district court's decision that the defendants' alleged conduct violated clearly established law, but the collateral order doctrine does not provide appellate jurisdiction to review the district court's decision that genuine issues of material fact exist for trial. Neither we nor the Supreme Court has decided definitively whether an appellate court with jurisdiction to review a final collateral order may ever simultaneously review related rulings that are not themselves immediately appealable. See Johnson, --- U.S. at ----, 115 S.Ct. at 2159 (assuming without deciding that an appellate court could exercise such jurisdiction); Swint, --- U.S. at ----, 115 S.Ct. at 1211-12 (expressing some doubt as to whether such jurisdiction existed). But cf. Abney v. United States, 431 U.S. 651, 663, 97 S.Ct. 2034, 2042, 52 L.Ed.2d 651 (1977) ("[S]uch claims are appealable if, and only if, they too fall within Cohen 's collateral-order exception to the final-judgment rule."). Even assuming, however, that such discretionary "appellate pendant jurisdiction" exists, we would not exercise it here. The district court's decision that the plaintiffs have created material issues of fact regarding the defendants' personal participation in the alleged conduct is not "inextricably intertwined" with that court's decision that the plaintiffs' allegations support a claim of violation of clearly established law, nor is review of the former decision "necessary to ensure meaningful review of the latter." Swint, --- U.S. at ----, 115 S.Ct. at 1212 (discussing, in the hypothetical, the scope of appellate pendant jurisdiction).
 
 III
 
 28
 We turn next to the question of whether the defendants are entitled to qualified immunity shielding them from liability for the plaintiffs' substantive due process claims. The defendants are entitled to qualified immunity only "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). "A necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is 'clearly established' at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all." Siegert v. Gilley, 500 U.S. 226, 232, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991).
 
 
 29
 We conclude that the plaintiffs have failed to state a claim of violation of their substantive due process rights. The panel majority reached this same conclusion by reasoning that even if the defendants faked an emergency and trumped up housing code violations for the purpose of relocating suspected criminals, their conduct was not irrational: "[T]he reduction of crime by relocating criminals and reducing urban blight bears a rational relation to the public health, safety and general welfare." Armendariz, 31 F.3d at 867.[4] We need not and do not address whether the City's conduct was rational. Even if the City's alleged conduct was "clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare," Euclid v. Ambler Realty Co., 272 U.S. 365, 395, 47 S.Ct. 114, 121, 71 L.Ed. 303 (1926), the plaintiffs' substantive due process claim fails because it is preempted by other constitutional claims under the rule of Graham v. Connor, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).
 
 
 30
 * We are all painfully aware that the area of substantive due process "has at times been a treacherous field" for the courts. Moore v. East Cleveland, 431 U.S. 494, 502, 97 S.Ct. 1932, 1937, 52 L.Ed.2d 531 (1977) (Powell, J., for plurality). The Supreme Court's opinion in Lochner v. New York, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905), now symbolizes an era in which the Court, invalidating economic legislation, engaged in a level of judicial activism which was unprecedented in its time and unmatched since. In an effort to scale back what had become an apparently unbounded source of judicial authority, the Supreme Court in recent decades has restricted the scope of substantive due process.
 
 
 31
 There can be no doubt that the Due Process Clause of the Fourteenth Amendment confers both procedural and substantive rights. See Foucha v. Louisiana, 504 U.S. 71, 80, 112 S.Ct. 1780, 1785, 118 L.Ed.2d 437 (1992); United States v. Salerno, 481 U.S. 739, 746, 107 S.Ct. 2095, 2101, 95 L.Ed.2d 697 (1987); Daniels v. Williams, 474 U.S. 327, 331, 106 S.Ct. 662, 664, 88 L.Ed.2d 662 (1986). However, the use of substantive due process to extend constitutional protection to economic and property rights has been largely discredited. See generally Gerald Gunther, Constitutional Law at 432-65 (12th ed. 1991). Rather, recent jurisprudence restricts the reach of the protections of substantive due process primarily to liberties "deeply rooted in this Nation's history and tradition." Moore, 431 U.S. at 503, 97 S.Ct. at 1937. Thus, the Fourteenth Amendment protects against a State's interferences with "personal decisions relating to marriage, procreation, contraception, family relationships, child rearing, and education," as well as with an individual's bodily integrity. Planned Parenthood v. Casey, 505 U.S. 833, 851, 112 S.Ct. 2791, 2807, 120 L.Ed.2d 674 (1992) (discussing cases); see Loving v. Virginia, 388 U.S. 1, 12, 87 S.Ct. 1817, 1823, 18 L.Ed.2d 1010 (1967) (marriage); Griswold v. Connecticut, 381 U.S. 479, 485, 85 S.Ct. 1678, 1682, 14 L.Ed.2d 510 (1965) (contraception); Rochin v. California, 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952) (bodily integrity); Pierce v. Society of Sisters, 268 U.S. 510, 534, 45 S.Ct. 571, 573, 69 L.Ed. 1070 (1925) (child rearing). These areas represent "a realm of personal liberty which the government may not enter." See Casey, 505 U.S. at 847, 112 S.Ct. at 2805. The cataloguing of these Fourteenth Amendment protections demonstrates that our Constitution embraces a notion of liberty encompassing more than the express provisions of the Bill of Rights.
 
 
 32
 However, we must pause before unnecessarily invoking substantive due process not grounded in explicit protections in specific amendments "because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." Collins v. Harker Heights, 503 U.S. 115, 125, 112 S.Ct. 1061, 1068, 117 L.Ed.2d 261 (1992). The specific guarantees of the first Eight Amendments stake out reliable limits to the exercise of government authority in particular situations. Thus, "[w]here a particular amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims.' " Albright v. Oliver, --- U.S. ----, ----, 114 S.Ct. 807, 813, 127 L.Ed.2d 114 (1994) (Rehnquist, C.J., for plurality) (quoting Graham, 490 U.S. at 395, 109 S.Ct. at 1871); see also Moore, 431 U.S. at 502, 97 S.Ct. at 1937 ("There are risks when the judicial branch gives enhanced protection to certain substantive liberties without the guidance of the more specific provisions of the Bill of Rights.").
 
 
 33
 In Graham, the Supreme Court held that claims of excessive force brought under section 1983 must be analyzed under the explicit textual sources of constitutional protection found in the Fourth and Eighth Amendments, not the more subjective standard of substantive due process. Graham, 490 U.S. at 394-95, 109 S.Ct. at 1870-71. The Court reaffirmed the Graham rule in Albright, where the plaintiff alleged that the defendants violated his substantive due process rights by initiating a criminal prosecution without probable cause to believe he had violated state law. Albright, --- U.S. at ----, 114 S.Ct. at 810. The Court noted that "[t]he Framers considered the matter of pretrial deprivations of liberty, and drafted the Fourth Amendment to address it." Id. at ----, 114 S.Ct. at 813. Because an explicit textual provision of the constitution protected against the area of governmental conduct challenged by the plaintiff, Graham precluded the plaintiff from obtaining additional relief under the notion of substantive due process. Id. at ---- - ----, 114 S.Ct. at 813-14.
 
 
 34
 One aspect of the plaintiffs' section 1983 claim alleges that the City closed the plaintiffs' buildings without notice or a hearing, invoking its emergency powers where no emergency existed; the panel's opinion provides a coherent and well-reasoned analysis of the procedural due process concerns implicated by this aspect of the plaintiffs' claim. See Armendariz, 31 F.3d at 865-66, 869-70. The plaintiffs' claim goes further, however. At its heart lies the plaintiffs' allegation that city officials conducted the sweeps and closed the plaintiffs' properties for no legitimate governmental purpose, i.e., for the purpose of allowing a shopping-center developer to acquire the properties at a reduced price. This allegation implicates substantive, not just procedural, concerns. "The first step in any [§ 1983] claim is to identify the specific constitutional right allegedly infringed". Albright, *-"-- U.S. at ----, 114 S.Ct. at 811. We recognize that "[c]ertain wrongs affect more than a single right and, accordingly, can implicate more than one of the Constitution's commands", Soldal v. Cook County, 506 U.S. 56, 69, 113 S.Ct. 538, 548, 121 L.Ed.2d 450 (1992), and that where the specific guarantees of more than one constitutional provision are implicated, "[t]he proper question is not which Amendment controls but whether either Amendment is violated", United States v. James Daniel Good Real Property, --- U.S. ----, ----, 114 S.Ct. 492, 499, 126 L.Ed.2d 490 (1993). Because the Fourth and Fifth Amendments provide explicit limitations on the type of government conduct challenged by the plaintiffs, Graham dictates that those Amendments, not the Fourteenth Amendment's guarantee of substantive due process, should guide the analysis of the plaintiffs' claim. This conclusion follows straightforwardly from Graham, for while this case does not arise in the criminal context, the Supreme Court's admonition in Graham is no less applicable here than in that case or in Albright.
 
 
 35
 * The Fourth Amendment, made applicable to the States by the Fourteenth Amendment, see Ker v. California, 374 U.S. 23, 30, 83 S.Ct. 1623, 1628, 10 L.Ed.2d 726 (1963), provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated". "A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." United States v. Jacobsen, 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984) (footnote omitted). The Fourth Amendment protects property interests as well as expectations of privacy. Soldal, 506 U.S. at 62-69, 113 S.Ct. at 544-48. To the extent that the defendants, in an attempt to dislodge residents suspected of criminal acts, interfered with the plaintiffs' possessory interest in their apartment buildings under the emergency provisions of the housing code, the reasonableness of the seizure is in question, since those provisions are not designed as law enforcement measures. Cf. Alexander v. San Francisco, 29 F.3d 1355, 1361 (9th Cir.1994) ("[A]n administrative search [to determine compliance with health and building codes] may not be converted into an instrument which serves the very different needs of law enforcement officials."). Thus, the plaintiffs' claim that the City faked violations of the housing code in order to interfere with the plaintiffs' interests in their properties for purposes unrelated to health and sanitation seeks redress for "a particular sort of government behavior", Albright, --- U.S. at ----, 114 S.Ct. at 813, against which the Fourth Amendment protects. Indeed, the Supreme Court stated explicitly in Soldal that "the right against unreasonable seizures would be no less transgressed if the seizure of the house was undertaken to collect evidence, verify compliance with a housing regulation, effect an eviction by the police, or on a whim, for no reason at all." 506 U.S. at 69, 113 S.Ct. at 548 (emphasis added).
 
 2
 
 36
 The Fifth Amendment's "Takings Clause," made applicable to the states through the Fourteenth Amendment, Chicago, B. & Q.R. Co. v. Chicago, 166 U.S. 226, 239, 17 S.Ct. 581, 585, 41 L.Ed. 979 (1897), see also Dolan v. Tigard, --- U.S. ----, ---- n. 5, 114 S.Ct. 2309, 2316 n. 5, 129 L.Ed.2d 304 (1994), requires that "private property [shall not] be taken for public use, without just compensation". The amendment also provides that "[n]o person shall be ... deprived of ... property, without due process of law." It is overwhelmingly clear from more than a century of precedent that the government violates the Constitution when it takes private property for private use, and the bar on such "private takings" is certainly well-established law for the purposes of the qualified immunity issue before us in this case: "[T]he Court's cases have repeatedly stated that 'one person's property may not be taken for the benefit of another private person without a justifying public purpose, even though compensation be paid.' "[5] Hawaii Housing Authority v. Midkiff, 467 U.S. 229, 241, 104 S.Ct. 2321, 2329, 81 L.Ed.2d 186 (1984) (quoting Thompson v. Consol. Gas Utilities Corp., 300 U.S. 55, 80, 57 S.Ct. 364, 376, 81 L.Ed. 510 (1937)); see also Madisonville Traction Co. v. St. Bernard Mining Co., 196 U.S. 239, 251-52, 25 S.Ct. 251, 255-56, 49 L.Ed. 462 (1905); Fallbrook Irrigation Dist. v. Bradley, 164 U.S. 112, 158, 17 S.Ct. 56, 63, 41 L.Ed. 369 (1896); Missouri Pac. R. Co. v. Nebraska, 164 U.S. 403, 417, 17 S.Ct. 130, 135, 41 L.Ed. 489 (1896). What plaintiffs allege is a scheme by defendants to evict tenants, deprive the plaintiffs of rental income that could have been used to bring the buildings into compliance, prevent owners from learning what repairs were necessary to come into compliance, and invent new violations after plaintiffs had conducted repairs that would bring their properties into compliance. The alleged purpose of this scheme was to deprive the plaintiffs of their property, either by forced sale, driving down the market value of the properties so a shopping-center developer could buy them at a lower price, or by causing the plaintiffs to lose their properties by foreclosure. In fact, the majority of the plaintiffs have lost their properties by foreclosure. If the plaintiffs can prove their allegations, the defendants' actions would constitute a taking of the property. Such a taking, if the allegations are true, would seem not to have been for a "public use" as the Fifth Amendment requires but rather for the use of another private person, the shopping-center developer. If the city council of San Bernardino had by ordinance declared that a shopping center on the plaintiffs' property would serve a public use by, for example, increasing legitimate business traffic in the area and providing jobs for neighborhood residents, the city might have been able to acquire plaintiffs' property through the payment of just compensation, under the power of eminent domain. See Berman v. Parker, 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954) (upholding taking of private property that government intended to reconvey to other private persons where the taking was part of a legislatively enacted plan found by legislature to be for public good). We hasten to add this is not an issue that we must decide.
 
 
 37
 While the Midkiff court noted that "where the exercise of the eminent domain power is rationally related to a conceivable public purpose, the Court has never held a compensated taking to be proscribed by the Public Use Clause", 467 U.S. at 241, 104 S.Ct. at 2329, what plaintiffs allege here is an uncompensated taking through a raw misuse of government power. If the allegations are true, the only determination that could possibly have been made that a shopping center on the plaintiffs' land was a "public use" would have been a secret determination by the defendants as executive-branch officials of the city or as individuals using the cloak of their official positions to effect their private ends. Thus, the usual extreme deference that courts owe to legislative determinations of public use, see Midkiff, 467 U.S. at 239-41, 104 S.Ct. at 2328-29, Berman, 348 U.S. at 32, 75 S.Ct. at 102 ("[W]hen the legislature has spoken, the public interest has been declared in terms well-nigh conclusive."), is not appropriate here. If officials could take private property, even with adequate compensation, simply by deciding behind closed doors that some other use of the property would be a "public use", and if those officials could later justify their decisions in court merely by positing "a conceivable public purpose" to which the taking is rationally related, the "public use" provision of the Takings Clause would lose all power to restrain government takings.
 
 3
 
 38
 It is clear from Graham and Albright that when the Fourth Amendment provides limitations on the type of government conduct challenged by a plaintiff's claim, that Amendment, rather than the constitution's substantive due process protections, must govern the plaintiff's claim. Those cases, after all, involved claims that the Court held were governed, at least in part, by the Fourth Amendment. But while Graham and Albright make clear that any "explicit textual source of constitutional protection", Graham, 490 U.S. at 395, 109 S.Ct. at 1871, preempts a more generalized substantive due process claim, the question of whether the constitutional bar on "private takings" preempts the plaintiffs' substantive due process claim is a difficult one because of the case law's imprecision as to the source of the bar: Does the prohibition originate in the Fifth Amendment Takings Clause ("[N]or shall private property be taken for public use, without just compensation."), in substantive readings of the Fifth and Fourteenth Amendment Due Process Clauses ("No person shall ... be deprived of life, liberty, or property, without due process of law."; "[N]or shall any State deprive any person of life, liberty, or property, without due process of law."), or in some other constitutional provision?[6] The answer to this question determines whether the constitutional right that the plaintiffs are seeking to vindicate is a specifically enumerated right, barring any resort to substantive due process under Graham and Albright, or whether that right is itself a substantive due process right.
 
 
 39
 Midkiff's restatement of the unconstitutionality of "private takings" does not expressly identify the source of that rule, nor do the cases cited there pinpoint its source. The major problem in locating the source of the constitutional bar on "private takings" in these cases is that they involved takings by a state or municipality and therefore depended on whether "private takings" violate the Due Process Clause of the Fourteenth Amendment. Unfortunately, the holdings that "private takings" do violate that clause usually have not made clear whether that violation arises from the fact that a "private taking" is inconsistent with due process itself--i.e., a violation of a substantive due process right--or from the fact that such a taking violates the Fifth Amendment Takings Clause as incorporated by the Fourteenth Amendment Due Process Clause.[7] See, e.g., Thompson, supra, (never expressly mentioning the Fourteenth Amendment); Cincinnati v. Vester, 281 U.S. 439, 50 S.Ct. 360, 74 L.Ed. 950 (1930) (noting in dicta that "private takings" violate the "Fourteenth Amendment", with no reference to the Due Process Clause); Madisonville Traction Co., 196 U.S. at 251-52, 25 S.Ct. at 255-56 (discussing "private takings" in terms of both the "essential nature of all free governments" and the Fourteenth Amendment Due Process Clause generally); Fallbrook Irrigation Dist., 164 U.S. at 158, 17 S.Ct. at 63, and Missouri Pac. R. Co., 164 U.S. at 417, 17 S.Ct. at 135 (decided before incorporation of Takings Clause).
 
 
 40
 Before the Court interpreted the Fourteenth Amendment as incorporating the Fifth Amendment Takings Clause, the Court apparently accepted the proposition that a state's taking of private property for a private use directly violated due process. See Davidson v. New Orleans, 96 U.S. 97, 102, 24 L.Ed. 616 (1878) ("It seems to us that a statute which declared in terms, and without more, that the full and exclusive title of a described piece of land, which is now in A, shall be and is hereby vested in B, would, if effectual, deprive A of his property without due process of law, within the meaning of the [Fourteenth Amendment]."); Fallbrook Irrigation Dist., 164 U.S. at 158, 17 S.Ct. at 63 (though the Fourteenth Amendment includes no Takings Clause, claim that taking for private use is deprivation of property without due process of law brings question of whether taking is for public use before the Court). Eventually, the Court squarely held a "private taking" violative of due process: "The taking by a state of the private property of one person or corporation, without the owner's consent, for the private use of another, is not due process of law, and is a violation of the 14th ... Amendment of the Constitution of the United States." Missouri Pac. R. Co., 164 U.S. at 417, 17 S.Ct. at 135 (1896).
 
 
 41
 However, as explained by a majority of the Supreme Court in Dolan, Chicago B. & Q.R. Co., a case decided within a year of Missouri Pacific, held that the Fourteenth Amendment's Due Process Clause incorporated the Takings Clause. Chicago B. & Q.R. Co. had cited Davidson and Missouri Pacific for the proposition that a "private taking" violated the Due Process Clause of the Fourteenth Amendment. 166 U.S. at 235, 17 S.Ct. at 584. However, the Court in Chicago B. & Q.R. Co. had discussed the Due Process Clause both in terms of substantive due process, id. at 234-35, 17 S.Ct. at 583-84 (state might comply with "forms of procedure" and give parties "fullest opportunity to be heard" and still violate Due Process Clause; "[i]n determining what is due process of law regard must be had to substance, not form"), and in terms of incorporation of the Takings Clause, id. at 238-39, 241, 17 S.Ct. at 585, 586. In 1994, the Dolan majority expressly rejected the suggestion, made by Justice Stevens in dissent, that Chicago B. & Q.R. Co. was "grounded in 'substantive' due process, rather than in the view that the Takings Clause of the Fifth Amendment was made applicable to the States by the Fourteenth Amendment". --- U.S. at ----, n. 5, 114 S.Ct. at 2316, n. 5. Therefore it is now clearly established that the Fourteenth Amendment Due Process Clause incorporates the Fifth Amendment Takings Clause and makes that provision effective against the states.
 
 
 42
 Unfortunately, Dolan 's clarification of the incorporation issue does not itself resolve the question of the source of the bar on "private takings". As noted above, many cases that considered the "private takings" issue after Chicago B. & Q.R. Co. based their decisions only on the Fourteenth Amendment, or on that amendment's Due Process Clause, without any indication of whether they were applying the Due Process Clause directly, or applying the Takings Clause through the Due Process Clause. See, e.g., O'Neill v. Leamer, 239 U.S. 244, 249, 36 S.Ct. 54, 56, 60 L.Ed. 249 (1915) ("[P]laintiffs sufficiently raised the question whether the appropriation was essentially for a private purpose, and hence contrary to the 14th Amendment, as amounting to a deprivation of property without due process of law."). This imprecision as to the source of the "private takings" bar may have been due to the uncertainty as to whether Chicago B. & Q.R. Co. was an incorporation case or a substantive due process case, given that even the members of the Supreme Court expressed conflicting opinions on that question as recently as 1994. However, Dolan 's rejection of the right against state takings as a substantive due process right rather than as an incorporated Takings Clause right strongly suggests that the Takings Clause, as applied to the states through the Due Process Clause of the Fourteenth Amendment, is the source of the right that the defendants allegedly violated in attempting to take the plaintiffs' property for a private purpose. The conclusion that the prohibition of "private takings" is implied from the Public Use Clause is supported by Cole v. La Grange, 113 U.S. 1, 5 S.Ct. 416, 28 L.Ed. 896 (1885), in which the Court interpreted a state constitutional provision almost identical to the Takings Clause:[T]he Constitution of Missouri ... declares that "no private property ought to be taken or applied to public use without just compensation." This clearly presupposes that private property cannot be taken for private use. Otherwise, as it makes no provision for compensation except when the use is public, it would permit private property to be taken or appropriated for private use without any compensation whatever.
 
 
 43
 Id., at 7-8, 5 S.Ct. at 419 (citations omitted). It seems highly probable that the Court would interpret the Takings Clause of the Fifth Amendment in the same way, since the basis for the Court's interpretation in Cole was the constitutional language rather than legislative history, extrinsic evidence, or interaction with other provisions of the Missouri Constitution, and since that language so closely parallels the federal constitution.
 
 
 44
 Thus, since the Takings Clause "provides an explicit textual source of constitutional protection" against "private takings", the Fifth Amendment (as incorporated by the Fourteenth), "not the more generalized notion of 'substantive due process,' must be the guide" in reviewing the plaintiffs' claim of a "private taking".[8] Graham, 490 U.S. at 395, 109 S.Ct. at 1871.
 
 
 45
 Because the conduct that the plaintiffs allege is the type of government action that the Fourth and Fifth Amendments regulate, Graham precludes their substantive due process claim.[9]
 
 B
 
 46
 Graham, then, is an insurmountable hurdle for the plaintiffs' substantive due process claim. Why then did a panel of our court find it necessary to reach the question of whether the City's alleged conduct was arbitrary and unreasonable? The answer to that question lies in a footnote in Sinaloa Lake Owners Association v. Simi Valley, 882 F.2d 1398 (9th Cir.1989) (as amended), cert. denied, 494 U.S. 1016, 110 S.Ct. 1317, 108 L.Ed.2d 493 (1990), first decided by this court prior to Graham and subsequently amended.
 
 
 47
 In Sinaloa, property owners sued the City of Simi Valley, claiming that the city had violated the Fourth, Fifth, and Fourteenth Amendments by breaching the owners' dam and draining their lake without adequate notice and for no rational reason. In addressing the plaintiffs' substantive due process claim, the court relied on our decisions finding violations of substantive due process in the prison abuse and excessive force contexts. Id. at 1409; see, e.g., Vaughan v. Ricketts, 859 F.2d 736, 738 (9th Cir.1988) (prison warden violated prisoners' substantive due process rights by conducting rectal searches for malicious purposes), cert. denied, 490 U.S. 1012, 109 S.Ct. 1655, 104 L.Ed.2d 169 (1989); Rutherford v. Berkeley, 780 F.2d 1444, 1446 (9th Cir.1986) (excessive force against arrestees violated substantive due process). Reasoning that "the fourteenth amendment's due process clause protects property no less than life and liberty," the court concluded that the plaintiffs could prevail on their substantive due process claim if they demonstrated that the defendants had destroyed the dam and lake for no legitimate reason. Id. at 1408-11.
 
 
 48
 Graham undermined the logic of the cases relied on by the court in Sinaloa; after Graham, we would no longer subject a plaintiff's claim of excessive force to substantive due process analysis. Nevertheless, the court's only discussion of Graham in Sinaloa was in a footnote, an apparent afterthought in which the court acknowledged that under Graham, claims of excessive force must be analyzed under the Fourth or Eighth Amendments. Sinaloa, 882 F.2d at 1408 n. 10. The court distinguished Graham without analysis and concluded that a plaintiff may state a violation of substantive due process by alleging that the government abused its power "in a setting not encompassed by some other enumerated right", id., when it should have determined whether the abuse of power implicated an enumerated constitutional right.
 
 
 49
 The conclusion in Sinaloa that the plaintiffs' substantive due process claim was not "encompassed by some other enumerated right" apparently was based on the fact that we rejected the plaintiffs' takings and Fourth Amendment claims.[10] However, Graham does not stand for the proposition that a plaintiff may bring a substantive due process claim whenever his potential claims under more specific provisions of the Bill of Rights fail; rather, Graham reflects the principle that courts should not expand the constitutional protections afforded by the Bill of Rights in those areas specifically addressed by the first eight amendments. Thus, Graham makes clear that the scope of substantive due process, however ill-defined, does not extend to circumstances already addressed by other constitutional provisions.
 
 
 50
 The soundness of the logic underlying the Graham rule is best displayed by examining what occurred when we disregarded the rule in Sinaloa. The plaintiffs were able to present what was essentially a takings claim without exhausting their state remedies, thereby escaping a critical prerequisite to ordinary Fifth Amendment takings claims. See Williamson County Regional Planning Comm'n v. Hamilton Bank of Johnson City, 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985) (plaintiff must seek compensation through state procedures before filing a federal takings claim). Permitting a plaintiff to bring a substantive due process claim whenever his claims under other constitutional provisions are unsuccessful, as we did in Sinaloa, gives the plaintiff, under substantive due process analysis, protection which the constitution does not afford, gutting the Graham rule of all meaning.
 
 
 51
 Since Sinaloa, the Supreme Court has made clear what was implicit in Graham. Substantive due process analysis has no place in contexts already addressed by explicit textual provisions of constitutional protection, regardless of whether the plaintiff's potential claims under those amendments have merit. In Albright, the Supreme Court, relying on Graham, rejected the plaintiff's substantive due process claim, holding that the Fourth Amendment provided the appropriate analysis for the claim. The Court explicitly refused to address whether the plaintiff could succeed on a Fourth Amendment claim, see --- U.S. at ----, 114 S.Ct. at 813, demonstrating that the merit of the plaintiff's potential claim is not the relevant inquiry for determining whether Graham precludes a substantive due process claim.
 
 
 52
 In sum, Sinaloa 's somewhat off-hand dismissal of Graham was wholly inconsistent with "[t]he doctrine of judicial self-restraint [which] requires us to exercise the utmost care whenever we are asked to break new ground in [the] field" of substantive due process. Collins, 503 U.S. at 125, 112 S.Ct. at 1068. To the extent that Sinaloa stands for the proposition that a plaintiff may bring a substantive due process claim whenever his other claims are unsuccessful, we overrule it now.
 
 
 53
 The plaintiffs urge us to stand by Sinaloa. They argue that Sinaloa is consistent with the maxim that certain conduct can implicate more than a single right and, accordingly, a plaintiff is entitled to seek relief under multiple constitutional theories. See James Daniel Good Real Property, --- U.S. at ----, 114 S.Ct. at 499 (where "the seizure of property implicates two explicit textual source[s] of constitutional protection, ... [t]he proper question is not which Amendment controls but whether either Amendment is violated" (internal quotation marks omitted)); Soldal, 506 U.S. at 69, 113 S.Ct. at 548 ("Where such multiple violations are alleged, we are not in the habit of identifying as a preliminary matter the claim's 'dominant' character. Rather, we examine each constitutional provision in turn.").
 
 
 54
 The plaintiffs' reliance on this general rule allowing a plaintiff to seek relief under multiple constitutional theories wholly ignores Graham, which we view as an exception to the rule, recognized out of a well-placed reluctance to expand the concept of substantive due process. See Collins, 503 U.S. at 125, 112 S.Ct. at 1068 ("the Court has always been reluctant to expand the concept of substantive due process"); Moore, 431 U.S. at 502, 97 S.Ct. at 1937 (history of the Lochner era "counsels caution and restraint" "lest the only limits to such judicial intervention become the predilections of those who happen at the time to be Members of this Court"). Under either view, the practical result is the same: The scope of substantive due process does not extend to areas addressed by other, more specific provisions of the Constitution.
 
 IV
 
 55
 We turn next to the plaintiffs' equal protection claim. The plaintiffs claim that the City targeted them for enforcement (or over-enforcement) of the housing code because the City wanted to deflate the value of the plaintiffs' properties so they could be replaced with commercial development. Thus, the plaintiffs allege that, for purposes of enforcing the City's housing code, the City created an irrational distinction between property owners whose properties the City wanted to acquire and other property owners. We conclude that such a distinction lacks any rational basis and that the defendants' conduct, if proved at trial, would constitute a violation of the plaintiffs' clearly established rights under the equal protection clause. Accordingly, the defendants are not entitled to qualified immunity at the summary judgment stage against the plaintiffs' equal protection claim.
 
 
 56
 Although state action that does not implicate a fundamental right or a suspect classification passes constitutional muster under the equal protection clause so long as it bears a rational relation to a legitimate state interest, New Orleans v. Dukes, 427 U.S. 297, 303-04, 96 S.Ct. 2513, 2516-17, 49 L.Ed.2d 511 (1976), "the rational relation test will not sustain conduct by state officials that is malicious, irrational or plainly arbitrary", Lockary v. Kayfetz, 917 F.2d 1150, 1155 (9th Cir.1990) (as amended).[11] See also Cleburne v. Cleburne Living Center, 473 U.S. 432, 446, 105 S.Ct. 3249, 3257, 87 L.Ed.2d 313 (1985) ("The State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational."). It is well established that a city may not enforce its zoning and land use regulations arbitrarily. See, e.g., Cleburne, 473 U.S. at 447, 105 S.Ct. at 3258; Lockary, 917 F.2d at 1155.
 
 
 57
 The Lockary court reversed a grant of summary judgment, holding that the plaintiffs had stated an equal protection claim by raising triable issues of fact as to whether the defendant municipal utility's alleged rationale for denying water hookups to the plaintiffs' property--a water shortage--was merely a pretext for the denials. Contrast Wedges/Ledges of California, Inc. v. Phoenix, 24 F.3d 56, 67 (9th Cir.1994) (affirming dismissal of equal protection claim where plaintiff did not offer evidence that city's asserted rationale was pretextual). The plaintiffs here, like those in Lockary, have raised a triable issue of fact as to whether the defendants' asserted rationale of directing efforts to enforce the housing code at high-crime areas was merely a pretext.
 
 
 58
 In response to the defendants' motion for summary judgment, the plaintiffs relied primarily on an affidavit submitted by John Edwins, a commercial developer, to support their claim that the defendants were motivated by a desire to acquire the plaintiffs' properties and replace the low-income housing units with commercial development. Edwins stated that he had met with Holcomb, Penman, and other city officials to discuss and plan a proposed commercial center on property then occupied by the plaintiffs' buildings. According to Edwins, Holcomb wanted to demolish or relocate the plaintiffs' buildings and replace them with commercial development and asked Edwins to purchase the buildings as a third party "strawman" so that the City's Redevelopment Agency could subsequently purchase them from him. In an effort to mitigate the City's costs of relocating the buildings' tenants and to suppress the value of the plaintiffs' properties, Edwins, Holcomb, and Penman discussed methods of preventing the plaintiffs from renting currently vacant apartments to tenants. Edwins suggested the possibility of removing the utility meters from unoccupied buildings; once the meters were removed, the plaintiffs could not rent the apartments without applying to the City for permits. On December 6, 1990, at the request of Holcomb, Edwins delivered to Penman an inventory of buildings from which meters could possibly be removed.
 
 
 59
 Only five days later, two investigators who work under Penman's supervision accompanied two housing code enforcement officers to the Arden-Guthrie area for a "cursory inspection." When the sweeps began about a month later, the first 35 buildings swept were, with two exceptions, the buildings included on Edwins' list provided to Penman.
 
 
 60
 Of course, a jury might reject the plaintiffs' claim that the defendants were motivated by a desire to deflate the value of the plaintiffs' buildings, purchase them, and replace them with a shopping center. However, if proven at trial, the facts alleged by the plaintiffs are sufficient to support a claim of a violation of the equal protection clause.
 
 
 61
 The defendants are not entitled to qualified immunity against this equal protection claim because our precedent established well before 1991 that a city cannot make land-use decisions based simply on its own desire to acquire a private owner's property for purposes unrelated to the city's action. In Parks v. Watson, 716 F.2d 646 (9th Cir.1983), the plaintiffs were developers who needed a vacation of city streets in order to proceed with planned development. In the ensuing negotiations between the developers and the city regarding the developers' vacation petition, the city demanded that the developers dedicate a strip of their property to the city. From the city's perspective, the advantage of a dedication over an easement was that dedication would give the city rights to geothermal wells on the developers' property. The developers refused to dedicate the strip of land, and the city denied the vacation petition. Id. at 649-50.
 
 
 62
 The plaintiffs sued city officials, arguing in part that the defendants had violated their equal protection rights. One of the purported bases for the city's denial of the vacation petition was to enable the city to acquire rights to the geothermal wells. We held that the city's interest in acquiring this property was not rationally related to its decision to deny the vacation petition. Id. at 654-55. "There is no rational basis for distinguishing between those seeking vacations of streets who own geothermal wells and those who do not. Ownership of such wells has no relationship to vacation of streets, nor is it argued that the value of the wells is in any way related to the value of the land being vacated." Id.
 
 
 63
 The defendants are not entitled to qualified immunity if "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). Like the plaintiffs in Parks, the plaintiffs here allege that city officials treated them differently from other property owners for a purpose unrelated to the government's interest in the activity employed to target them. The City has an obvious interest in preventing safety and sanitation hazards by enforcing the housing code. However, the fact that the plaintiffs owned property which certain City officials wanted replaced with commercial development has no rational relationship to that interest. Based on Parks, the defendants should have known that the equal protection clause prohibited them from targeting the plaintiffs for overzealous enforcement of the housing code so that the plaintiffs' properties could be acquired below market value.
 
 
 64
 Accordingly, we affirm the district court's denial of the defendant's motion for summary judgment on the plaintiffs' equal protection claim.
 
 CONCLUSION
 
 65
 We have jurisdiction to review only the district court's decision that the defendants' alleged conduct, if proven at trial, violated clearly established law. We dismiss the appeal to the extent it raises issues as to whether genuine issues of material fact exist. Because explicit textual provisions of constitutional protection cover the areas of conduct challenged by the plaintiffs, substantive due process provides the plaintiffs no additional relief. Accordingly, we reverse the district court's denial of summary judgment to all defendants on the plaintiffs' substantive due process claim. We also reverse the district court's denial of summary judgment to all defendants on plaintiffs' Fair Housing Act claim. All defendants are entitled to summary judgment granting qualified immunity on the substantive due process and Fair Housing Act claims. We affirm the district court's denial of summary judgment as to all defendants on the plaintiffs' equal protection and procedural due process claims.
 
 
 66
 AFFIRMED in part, REVERSED in part.
 
 
 67
 Judge KOZINSKI and Judge NOONAN concur in the judgment only.
 
 
 68
 WALLACE, Chief Judge, concurring and dissenting:
 
 
 69
 I agree with the majority except for part IV; there we part company because I conclude that the City officials' (City) sweeps in Arden-Guthrie, as a matter of law, did not violate the Equal Protection Clause.
 
 
 70
 It has been settled for decades that unless the government's actions affect a fundamental right or employ suspect classifications such as race or religion, there is no denial of equal protection unless the challenged classification cannot be said to be rationally related to a legitimate state interest. See City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 446, 105 S.Ct. 3249, 3257, 87 L.Ed.2d 313 (1985) (Cleburne ) (government action that burdens individuals unequally but does not burden "suspect class" need only survive rational basis review). Clearly there is no fundamental right to be a landlord in a slum. Nor is there any allegation that the City targeted the landlords in Arden-Guthrie on the basis of any suspect classification. Thus, the landlords can state an equal protection claim only if the City's decisions to treat them differently has no conceivable relationship to any legitimate state interest.
 
 
 71
 The Supreme Court has made it clear that in applying the "rational relation" test in the context of an equal protection challenge, a court may not ask whether the government action is rationally related to the actual or avowed purpose for the action. Rather, government action must be held to have met the rational relation test unless that action bears no rational relation to any "plausible, arguable, or conceivable" purpose for the action. Jackson Water Works v. Public Utilities Commission of California, 793 F.2d 1090, 1094 (9th Cir.1986) (internal quotation omitted), cert. denied, 479 U.S. 1102, 107 S.Ct. 1334, 94 L.Ed.2d 184 (1987); see also United States v. Harding, 971 F.2d 410, 412 (9th Cir.1992) (test met if court can "divine some rational purpose") (internal quotation omitted), cert. denied, 506 U.S. 1070, 113 S.Ct. 1025, 122 L.Ed.2d 170 (1993); Licari v. Commissioner, 946 F.2d 690, 692 (9th Cir.1991) (classification not set aside "if any state of facts rationally justifying it is demonstrated to or perceived by the courts") (citation omitted). As the Supreme Court recently reiterated with respect to a legislature's classification, "those attacking the rationality of the legislative classification have the burden to negative every conceivable basis which might support it. Moreover, because we never require a legislature to articulate reasons for enacting a statute, it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature." FCC v. Beach Communications, 508 U.S. 307, 315, 113 S.Ct. 2096, 2102, 124 L.Ed.2d 211 (1993) (internal quotation and citations omitted).
 
 
 72
 Thus, under the Supreme Court's formulation of the applicable test, a court must uphold a government action that is related to some conceivable purpose. But here, I need not formulate a hypothetical purpose. Even under the landlords' own proffered rationales for the City's actions, I would hold that the City's actions did not violate the Equal Protection Clause. In justifying its conduct, the City relied on the San Bernardino Municipal Code, which vests building officials with the discretion to require that a building be vacated if the City found serious violations. Maj. op. at 1314. The landlords offer two alternate rationales for the City's sweeps: "One alleged purpose of the sweeps was to force tenants with criminal records or suspected gang affiliations or both to relocate outside the City.... The plaintiffs also allege that city officials conducted the sweeps to enable a commercial developer to acquire contiguous property in Arden-Guthrie on the cheap ... and replace [it] with a planned shopping center." Id. at 1314-15. Essentially, then, the landlords allege that the City had two conceivable motives for the sweeps. First, the City could have been concerned with the level of crime, choosing to combat crime by forcing tenants in a high crime area to disperse and relocate. Second, the City may have wanted to see that crime-infested buildings be razed and replaced with a shopping center.
 
 
 73
 The majority latches on to one alleged purpose for the sweeps--the City's interest in devaluing the landlords' properties--and holds that this purpose bears no rational relationship to the City's actions. An incorrect analysis usually leads to an incorrect result. I would hold instead that because at least one of the landlords' alleged reasons--the desire to combat crime--is rationally related to the government's actions, the City officials did not violate the Equal Protection Clause.
 
 
 74
 The Arden-Guthrie landlords' equal protection claim is nothing more than an argument that the housing codes were enforced in a selective and arbitrary manner. The City legitimately may choose to enforce its laws against Arden-Guthrie landlords rather than other property owners so long as the decision is not arbitrary. Oyler v. Boles, 368 U.S. 448, 456, 82 S.Ct. 501, 505, 7 L.Ed.2d 446 (1962) (conscious exercise of selectivity in enforcement not itself an equal protection violation unless "selection was deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification"); see also Freeman v. City of Santa Ana, 68 F.3d 1180, 1188 (9th Cir.1995) ("[s]elective enforcement of valid laws, without more, does not make the defendants' action irrational"). It cannot be said that the landlords' posited standard for selection--targeting housing violations in an area in which tenants are committing crimes at a high rate--is "so attenuated" as to be "arbitrary or irrational." See Cleburne, 473 U.S. at 446, 105 S.Ct. at 3257.
 
 
 75
 As the majority acknowledges, maj. op. at 1326, no fundamental right or suspect classification is at issue here. I would therefore grant the officials qualified immunity because it was conceivably rational for the City to choose to target Arden-Guthrie on the basis that it was a high crime neighborhood. It was also conceivably rational for the City to choose to close certain buildings in which extreme housing code violations or more serious crime problems were found.
 
 
 76
 SCHROEDER, Circuit Judge, concurring in part and dissenting in part:
 
 
 77
 I concur in all portions of Judge Fletcher's opinion except the analysis of the Takings Clause in Part III.A.2 and 3.
 
 
 78
 I cannot agree with the majority that the enforcement of housing codes can result in a claim of a taking for non-public use. The Supreme Court has made it abundantly clear that the "public use" requirement is coterminous with the scope of a sovereign's police power, and that where a taking is "rationally related to a conceivable public purpose" the taking is not proscribed by the Public Use Clause. See Hawaii Housing Authority v. Midkiff, 467 U.S. 229, 241, 104 S.Ct. 2321, 2329, 81 L.Ed.2d 186 (1984); Berman v. Parker, 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954) (upholding legislation providing for taking of slum areas for possible sale or lease to private interests). Enforcing housing codes is rationally related to a public purpose. We should not let the Takings Clause become a device for litigating the wisdom or motivations behind municipal law enforcement.
 
 
 79
 BEEZER, Circuit Judge, concurring in part and concurring in the judgment:
 
 
 80
 I concur in all but the Fifth Amendment analysis in Parts III.A.2 and 3 of the court's opinion.
 
 
 81
 Identification of a possible Fourth Amendment claim suffices to encompass plaintiffs' grievances within the ambit of Albright 's limitation on Substantive Due Process claims. Albright v. Oliver, --- U.S. ----, ----, 114 S.Ct. 807, 813, 127 L.Ed.2d 114 (1994).
 
 
 82
 It is not necessary to analyze any Takings claims which may be available to plaintiffs.
 
 
 
 [1]
 The owners also claim that the City cited other, even more seemingly pretextual reasons for closing the buildings, such as the lack of smoke detectors in uninhabited buildings or the absence of adequate venting for electric water heaters. See ER 378 (Declaration of John Rampello). At least one housing code inspector refused to close buildings on these grounds. ER 630-31 (Deposition of Merle Dean Pagel)
 
 
 [2]
 Although the panel considered the allegations of the denial of loans as an independent claim of a violation of substantive due process, we read the plaintiffs' allegations as complaining of the denial of loans as merely one part of a larger scheme, allegedly violative of substantive due process, designed to deprive the plaintiffs of their property
 
 
 [3]
 The panel opinion describes in some detail these defendants' alleged roles in the program, Armendariz v. Penman, 31 F.3d 860, 863-64 (9th Cir.1994)
 
 
 [4]
 The panel did not address the plaintiffs' allegation that the City conducted the sweeps to lower property values so that a commercial developer could acquire the property and build a shopping center
 
 
 [5]
 Because a "private taking" cannot be constitutional even if compensated, a plaintiff alleging such a taking would not need to seek compensation in state proceedings before filing a federal takings claim under the rule of Williamson County Regional Planning Comm'n v. Hamilton Bank of Johnson City, 473 U.S. 172, 194-97, 105 S.Ct. 3108, 3120-22, 87 L.Ed.2d 126 (1985)
 
 
 [6]
 A commentator on eminent domain has noted:
 "Courts have not always agreed on the reason for this limitation. Initially, courts claimed that the taking of private property for a private purpose violated natural justice or natural law. Another reason given for this limitation was that takings for private purposes were beyond the scope of the power of legislatures.... Another theory put forward ... was that the [Takings Clause] by implication prohibited the taking of property for uses not public, with or without compensation....
 ... In the United States, a taking of property by eminent domain for a use not public is considered such a violation of the basic and essential features of a constitutional government that it amounts to a taking without due process of law."
 Nichols' The Law of Eminent Domain, 3d rev. ed. (Julius L. Sackman, ed.), §§ 7.01 to 7.01a, v. 2A, pp. 7-21 to 7-23 (1995) (footnotes omitted).
 
 
 [7]
 Early statements of the Court on "private takings" grounded the prohibition in neither the Takings Clause nor any other particular constitutional provision. See, e.g., Calder v. Bull, 3 U.S. (3 Dall.) 386, 388, 1 L.Ed. 648 (1798) (Chase, J.) (noting that because "[i]t is against all reason and justice, for a people to entrust a Legislature with such powers" as the power to enact "a law that takes property from A. and gives it to B.", the legislature cannot be presumed to have such powers); Citizens' Sav. & Loan Ass'n v. Topeka, 87 U.S. (20 Wall.) 655, 663, 22 L.Ed. 455 (1875) (stating that a statute declaring that "the homestead now owned by A should no longer be his, but should henceforth be the property of B" would be invalid because of the "limitations on [government] power which grow out of the essential nature of all free governments"). See also Madisonville Traction, 196 U.S. at 251-52, 25 S.Ct. at 255-56 (principle that "private property cannot be taken by the government, national or state, except for purposes which are of a public character, although such taking be accompanied by compensation ... grows out of the essential nature of all free governments.")
 
 
 [8]
 One might be tempted by the more than a century's worth of law holding that "private takings" violate the Constitution to treat the right against "private takings" as a substantive due process right. If this were because such takings violate a substantive reading of the Fourteenth Amendment Due Process Clause directly, the plaintiffs would have alleged a substantive due process violation that Graham and Albright would not preclude, since the Supreme Court's own cases recognizing the right in question would be read to locate the explicit textual source of protection against "private takings" in a substantive reading of the Fourteenth Amendment Due Process Clause. This substantive reading of the Due Process Clause would perhaps present fewer concerns about the "scarce and open-ended" guideposts for responsible decisions that usually accompany substantive due process rulings, given the long history of the right against "private takings" and the certainty that the "property" referred to in the Due Process Clause includes real property. Nonetheless, we are persuaded that the Takings Clause, as a more explicit textual source, should be read as the home of the right against "private takings"
 
 
 [9]
 The plaintiffs' complaint does not claim that the defendants violated their rights under the Fourth or Fifth Amendments. The decision to omit such claims may have been a sound one in light of Sinaloa Lake Owners Association v. Simi Valley, 882 F.2d 1398 (9th Cir.1989) (as amended), cert. denied, 494 U.S. 1016, 110 S.Ct. 1317, 108 L.Ed.2d 493 (1990), which, as explained in Section III.B, infra, erroneously suggested that a plaintiff could pursue a substantive due process claim even if an explicit textual source of constitutional protection existed against the challenged governmental conduct. Because the plaintiffs' substantive due process claim challenges the same conduct as any potential Fourth and Fifth Amendment claims, the plaintiffs may have decided to pursue only the former, believing the "scarce and open-ended" standards of substantive due process to be more favorable than the standards required under the Fourth and Fifth Amendments
 It would be within the district court's discretion to permit the plaintiffs on remand to amend their complaint to include claims under the Fourth and Fifth Amendments. See Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires"); Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962) ("spirit of the Federal Rules" requires liberality of amendment). Although the parties have conducted considerable discovery, permitting the plaintiffs to pursue Fourth and Fifth Amendment claims at this stage in the litigation would not appear to prejudice the defendants in light of the overlap between these claims and the plaintiffs' substantive due process claim.
 
 
 [10]
 We rejected the plaintiffs' takings claim because the plaintiffs had failed to exhaust their state remedies. 882 F.2d at 1401-04. We rejected the plaintiffs' Fourth Amendment claim on the ground that the claim was "properly asserted under the fifth ... amendment[ ]" and therefore, like the takings claim, was unripe. Id. at 1411. Intervening Supreme Court authority calls into serious question the accuracy of the latter holding. See James Daniel Good Real Property, --- U.S. at ----, 114 S.Ct. at 499 (seizure of property implicates both Fourth and Fifth Amendments); Soldal, 506 U.S. at 69, 113 S.Ct. at 548 (plaintiff could pursue Fourth Amendment claim for seizure of property even though Fifth Amendment's general protection of property was also implicated)
 
 
 [11]
 This holding of Lockary applied to both an equal protection and a substantive due process claim. Thus, if the plaintiffs' substantive due process claim were not precluded by Graham, this would be the proper standard to apply both to the city's assertion that its housing code enforcement in this case is justified by law enforcement motives and to the plaintiffs' allegations that the enforcement was designed to drive down the market value of their property