Amrut N. PATEL; Sita Patel,
Plaintiffs–Appellants,

v.

James F. PENMAN, City Attorney; Community Redevelopment Agency of the City of San Bernardino; Building and Safety Department of the City of San Bernardino; Housing and Community Development Department of the City of San Bernardino, Defendants–Appellees.

No. 95–55213.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 6, 1996.

Decided Dec. 26, 1996.

Frank A. Weiser, Los Angeles, CA, for plaintiffs–appellants.

Robert L. Simmons, Senior Deputy City City Attorney, Cynthia Ludvigsen, San Bernardino, CA, for defendants–appellees.

Before: FLETCHER, BEEZER and KLEINFELD, Circuit Judges.

## OPINION

FLETCHER, Circuit Judge:

Amrut and Sita Patel appeal the jury verdict against them on their § 1983 claim alleging that the City of San Bernardino violated their procedural due process rights by not affording them notice and an opportunity for a hearing after the City closed down their motel as a nuisance. The Patels also appeal the district court's summary judgment for the City on their § 1983 claims of alleged violations of substantive due process and equal protection, as well as the district court's decision declining to exercise supplemental jurisdiction over their inverse-condemnation claim based on the California constitution. We have jurisdiction over the appeal pursuant to 28 U.S.C. § 1291 and affirm in part and reverse in part.

## FACTUAL BACKGROUND [1]

The Patels purchased the Super–7 Motel in downtown San Bernardino in 1984. The motel apparently contains approximately 40 rooms, and appears to have been occupied primarily by short- and medium-term residents rather than by transient travelers.[2] The City alleged in moving papers below that in the three years before 1990 the City's police department reported over 300 calls to the motel for assistance with illegal activity and that the motel had been the site of "numerous drug and narcotic busts and prostitution arrests".

Since at least 1987, the Patels had leased the motel to various lessees. In June of 1990, the lease was assigned to Mahendra and Minaxi Desai.

In 1990, the City designed and implemented a program to inspect all motels within its boundaries.[3] In March of that year, the City

---

1. This case arises out of circumstances similar to those involved in *Armendariz v. Penman*, 75 F.3d 1311 (9th Cir.1996) (en banc), in which the court reviewed the claims of residential landlords whose properties had been the subject of code-enforcement actions by the City.

2. A 1990 City-conducted survey of the occupants of 15 of the 20 occupied rooms at the motel found that nine rooms had been occupied for one to four weeks, four rooms had been occupied for two to three months, one room had been occupied for six months, and one room had been occupied for seven years.

3. In an article published in the 17 September 1990 edition of the *San Bernardino Sun*, James Penman, the City's elected city attorney, discussed the program:

 A room-to-room motel survey revealed that San Bernardino has become a repository for parolees and welfare recipients from other communities. A growing number of families come to California because they have heard that the welfare benefits are greater here than in their home states. Many of these families stop in San Bernardino.

 Welfare recipients choose a motel from a list provided by the Department of Public Social Services. There are 31 motels on this list—24 in San Bernardino, seven in other cities. Public funds pay rent to these motels of as much as $700 to $800 per month per family.

issued a "Notice of Violation" regarding the motel, specifying numerous violations and indicating that four units had been "abated" and posted as "dangerous." The Notice stated that the violations had to be corrected within ten days and that permits were required for the work needed to bring two units into compliance. A second Notice of Violation was issued the following month.

In May 1990 another Notice of Violation was issued, apparently regarding violations on the grounds of the motel rather than in the rooms. This Notice included a note directing that rooms not be rented until the violations were corrected because the motel was in violation of its "conditions of approval."

A "Notice to Abate Nuisance" was issued on August 27, 1990 and listed at least 14 code violations at the motel. The Notice, which identified Mahendra Desai as the property owner, indicated that the "nuisance(s)" must be corrected by September 10th, and stated that if the owner objected to the determination of a nuisance, he "must file a written protest to the City Clerk no later than 10 days from the date of this notice." The Notice also stated that four units were closed due to unfit conditions and could not be rented until corrections were made. Mr. Patel stated in a sworn declaration that he received a copy of this Notice in the mail from Mr. Desai. On August 29, 1990, Mr.

Desai apparently obtained building permits to conduct repairs.

On September 4, 1990, pursuant to an administrative warrant, the City inspected the motel. City Attorney James Penman, investigators from the City Attorney's office, Code Compliance Supervisor Debra Daniel, several code compliance officers, and a fire department inspector were present at the inspection. The inspection found code violations including faulty plumbing, illegally installed kitchens, exposed electrical wiring, roach infestation, and missing smoke detectors. The City officials concluded that the motel constituted an extreme health and safety hazard to the residents and ordered it closed immediately. Residents were apparently provided with relocation assistance by the City.

The City appears to have acted pursuant to Chapter 15.28 of the San Bernardino Municipal Code on "Dangerous Buildings." Section 15.28.140(A) gives the City building official the "summary power to secure from entry any structure which in his discretion he determines to be immediately dangerous or hazardous, or in any other manner injurious to public health or safety ... using methods at his discretion to accomplish the purpose which are most appropriate under the circumstances." Section 15.28.150 allows the building official to use the same procedures "in connection with the summary abatement

....
We have found as many as 12 people, mostly children, in rooms with a maximum legal capacity of two. These rooms are usually filthy and insect infested. Putrid smells permeate walls, floors and ceilings.

....
One year ago, crime in downtown San Bernardino had far surpassed crime in every other area of the city. Robberies, burglaries, rapes, prostitution, gangs and other crimes appeared to be our downtown's future.

Then, in March, the city closed down a large motel on D Street. The three to five burglaries a day in the vicinity dropped to zero. Vandalism at adjacent businesses disappeared. Prostitutes and drug dealers left nearby street corners. Legitimate business improved.

In June, another motel was closed on Fifth Street. Police officers reported an immediate 15 percent decrease in their calls in that area.

....
More than 40 families have been relocated to permanent housing—some of it outside San Ber-

nardino, some within the city. We will continue to move people out of motels in San Bernardino. Those whom we know to be involved in criminal activity will be lawfully encouraged to relocate outside of our city, and preferably, outside of our county. The city will not subsidize this relocation beyond providing trucks and vans to physically move those who voluntarily request transportation.

....
Closing motels and enforcing building codes at motels that remain open will not, of itself, eliminate crime in our downtown. But we will help reduce it.

As soon as we finish with the motels, we will increase our attacks on substandard apartment units found throughout San Bernardino.

We're also sending a message to parolees and to the Department of Public Social Services ... [W]e'll no longer be the dumping ground for parolees and chronic welfare recipients from other states and communities.

of all other nuisances upon private property which the building official determines in his discretion to constitute an immediately dangerous or hazardous condition." Section 15.28.140(C) requires the building official, "immediately after" securing a dangerous building, to "mail a notice to the owners" of the property informing them:

 (1) that he has secured the structure;

 (2) the cost incurred by the City thereby;

 (3) that he has posted signs as provided by this section;

 (4) the reasons why he has taken the action;

 (5) that an appeal may be made within ten days to the Board of Building Commissioners, to be set for hearing at the next regular meeting;

 (6) that if his action is not annulled by the Board of Building Commissioners, the cost of securing the property shall become a lien upon the real property unless the cost is paid to the City within thirty days of the mailing of the notice.

Section 15.28.140(D) governs appeals to the Board.

A.L. Williams, a code compliance officer for the City, issued a "Notice to Abate Nuisance" on September 4th. The Notice identified "Mahendra B. Desai (agent for Patel)" as the owner and stated that the motel's units were closed "due to safety violations, operating a business without a business license or a proper [certificate of occupancy, and] substandard conditions in this complex." The Notice stated that the owner or his agent could not repair or improve the premises without a proper permit and that rooms could not be occupied until the motel passed an inspection by the building and safety department, the fire and police departments, and the city attorney's office. The Notice stated that the owner had until September 14, 1990 to apply for permits to make repairs and that the owner had 10 days from the date of the notice to file a written protest with the City Clerk's office if the determination of a nuisance was contested. Desai, in a sworn declaration, stated that he immediately sent a copy of the notice to Mr. Patel. Mr. Patel stated in a sworn declaration that he received a copy of this notice from Mr. Desai,

though Patel testified at trial that he had never received the document.

On September 26, 1990, Williams wrote a letter to the Patels, addressed to them at their address in Upland, California, which stated that it constituted service of a "Correction Notice" as to the motel. Attached to the letter was a two-page "Unit Inspection Report", prepared on September 10, 1990, that detailed the code violations at the motel found during the September 4, inspection. The report indicated that the violations had to be corrected in 10 days and that permits were required for the repairs; the letter stated the same instructions and requested that the Patels "contact this office within ten (10) calendar days from the date of this notice to make arrangements to correct [the] violations." The report indicates that a copy was mailed to the owner by certified mail on September 26, 1990. Although Mr. Patel testified at trial that he had never received this letter, he stated in his sworn declaration that he received the letter on or about September 27, 1990.

In his sworn declaration, Mr. Patel stated that within the ten-day period specified in the September 26th letter he went to the City's planning and building department to apply for building permits to repair the motel and that he was told by Daniel that building permits would not be issued at that time. At trial, under cross-examination, Mr. Patel testified that he had never applied for building permits to rehabilitate the motel.

On October 29, 1990, Larry Reed, the director of the City's Department of Planning and Building Services, wrote the Patels and notified them that the motel had been determined to be a public nuisance in violation of city ordinances. It is unclear whether this determination refers to the violations cited in the September 4 and September 26 notices or whether it is a new determination based on the unoccupied state of the motel after the closure. Reed stated that an emergency abatement of the property had been made in order to protect the health and safety of the community and that the costs of the abatement amounted to $598.34, which the Patels should remit to the city clerk's office within

30 days. Mr. Patel testified at trial that he had never received this letter personally or by mail, but in his sworn declaration he stated that he received the letter on October 29.

The October 29 letter also stated that a hearing on the matter had been scheduled before the Board of Building Commissioners on December 7, 1990 at 9:00 a.m. and informed the Patels that they had the right to present evidence challenging the abatement at the hearing. On December 7, the Board met but immediately cancelled its meeting due to lack of a quorum.

Mr. Patel stated in his declaration that he went to the planning and building services department during the last week of November 1990 to obtain building permits for repairs to the motel but that the permits were denied. At trial, under cross-examination, Mr. Patel testified that he had never applied for building permits to rehabilitate the motel.

A criminal complaint was also filed by the City against Amrut Patel in the fall of 1990. The complaint charged 40 counts of violation of the City's municipal code, all involving the condition of the motel on September 4, 1990. After numerous continuances, the complaint was dismissed as to Mr. Patel on July 15, 1991, and Jayanti Morarji, who was apparently the Patels' on-site manager, was substituted as defendant. On the same day, pursuant to a plea bargain, Morarji pled nolo contendere to the first 20 counts of the complaint and was fined $1,330 and ordered to pay restitution of $2851.55 to the City; the remaining 20 counts were dismissed.

## PROCEEDINGS BELOW

The Patels on March 15, 1991, filed a complaint for inverse condemnation and injunctive and declaratory relief against the City and other defendants in federal court. A first amended complaint was filed on April 24, 1991, before any responsive pleading was filed. Essentially the complaint sought compensation for a taking under the Fifth and Fourteenth Amendments. The district court dismissed the complaint nearly a year later for lack of subject matter jurisdiction "due to failure to exhaust state remedies" as required by *Williamson County Regional Planning Commission v. Hamilton Bank*, 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985).

On March 1, 1992, the Patels filed a Second Amended Complaint alleging federal claims under 42 U.S.C. § 1983 for violations of their constitutional rights to procedural and substantive due process and to equal protection and under 42 U.S.C. § 3604(b) (the Fair Housing Act); the complaint included a supplemental state-law count for inverse condemnation under Article 1, § 19 of the California Constitution. This complaint named as defendants the City, the City's Economic Development Agency, various named city officials (including Penman, Williams, Reed, and Daniel, as well as W.R. Holcomb, the mayor at the time of the closure), and Does 1–100.

On December 2, 1992, the district court granted summary judgment on defendants' motion to all individual defendants (on the basis of qualified immunity and the inapplicability of Art. I, § 19 of the California constitution to individuals) and granted summary judgment on the Fair Housing Act claim to all defendants. The Patels have not appealed from those rulings. The district court also decided to exercise its discretion under 28 U.S.C. § 1367(c) to dismiss without prejudice the Patels' supplemental state-law claim for inverse condemnation. The Patels have appealed from this dismissal.

Three months later, the district court, in response to a summary judgment motion by the defendants, entered an "Order Determining Issues Without Substantial Controversy." It found that no genuine issue of material fact existed (1) as to the Patels' substantive due process claim "because defendants' actions were not clearly arbitrary and unreasonable, [and] had a substantial relation to public health, safety, morals or general welfare" and (2) as to the Patels' equal protection claim because the Patels "have been unable to show that other motel properties similarly situated were treated differently."

A trial on the Patels' remaining procedural due process claim against the City[4] was held in January 1995. At the beginning of the next day, the Patels abandoned their claim that their rights to procedural due process were violated by the lack of notice and opportunity to be heard *before* the motel was closed, so the sole remaining issue was whether the City had violated the Patels' due process rights by denying them notice and an opportunity to be heard after the closure of the motel. The jury returned a verdict in favor of the City, from which the Patels have timely appealed.

## DISCUSSION

### Alleged Pretrial Errors

#### I. Summary Judgment

The Patels appeal the district court's grant of summary judgment for the City on their claims of substantive due process and equal protection. A grant of summary judgment is reviewed *de novo*. *Jesinger v. Nevada Federal Credit Union*, 24 F.3d 1127, 1130 (9th Cir.1994).

#### A. Substantive Due Process

Appellants argue that the City violated their substantive due process rights not merely by closing the motel but by refusing to grant building permits necessary to make repairs that would cure the cited violations and allow the Patels to reopen the motel. The gravamen of the Patels' argument is that the City acted to drive the motel out of business.[5] In opposing the City's motion for summary judgment on this claim, the Patels pointed to (1) the declaration of their attorney on his unsuccessful attempts to reach an agreement with the City to allow the motel to reopen; (2) Mr. Patel's declaration that he applied for building permits after the motel

closure but that the application was denied; and (3) a January 9, 1991 memo from Daniel to Reed inquiring as to the status of proceedings to revoke the conditional use permits of the closed motels, including the Patels', in which Daniel states that pre-permit inspections have been completed and she expects the owners to request building permits which could not be denied in the absence of a court order and that "[i]f motel owners are allowed to rehabilitate or operate under existing approved [conditional-use-permit] requirements a temporary solution only will be created for substandard conditions and blight of motels in our downtown area".

To establish a violation of substantive due process in this context, a plaintiff is ordinarily required to prove that a challenged government action was "clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare". *Euclid v. Ambler Realty Co.*, 272 U.S. 365, 395, 47 S.Ct. 114, 121, 71 L.Ed. 303 (1926); *Bateson v. Geisse*, 857 F.2d 1300, 1303 (9th Cir.1988). However, "[w]here a particular amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing [a plaintiff's] claims'." *Albright v. Oliver*, 510 U.S. 266, 273–74, 114 S.Ct. 807, 813, 127 L.Ed.2d 114 (1994) (Rehnquist, C.J., for plurality) (quoting *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989)).

Here, the Patels challenge government conduct that is explicitly limited by the Takings Clause of the Fifth Amendment.[6] If the City did in fact close the motel for code violations and refuse to issue building per-

---

4. A joint pre-trial conference order filed by the parties on March 29, 1993 indicated that the City was the sole remaining defendant; the Economic Development Agency had apparently been dismissed by consent of the parties.

5. Although the Patels' complaint alleged that the City acted "with the motive and intent of depressing the property value in order that the City would eventually 'acquire' the property, either directly or indirectly, for other, possibly commer-

cial, purpose [sic]," they appear to have offered no support for this allegation in order to raise a genuine issue of material fact sufficient for the court to deny summary judgment.

6. The Takings Clause is made applicable to the States by the Due Process Clause of the Fourteenth Amendment. *See Dolan v. City of Tigard*, 512 U.S. 374, 384 n. 5, 114 S.Ct. 2309, 2316 n. 5, 129 L.Ed.2d 304 (1994); *Armendariz v. Penman*, 75 F.3d 1311, 1320 (9th Cir.1996) (en banc).

mits necessary for the Patels to bring the motel into compliance all in order to drive the motel out of business, such actions would constitute a taking of the Patels' property. *See Armendariz v. Penman,* 75 F.3d 1311, 1321 (9th Cir.1996) (en banc) (alleged scheme "to evict tenants, deprive [owners] of rental income that could have been used to bring the buildings into compliance, prevent owners from learning what repairs were necessary to come into compliance, and invent new violations after [owners] had conducted repairs that would bring their properties into compliance." all in order to cause owners to lose properties in foreclosure, "would constitute a taking"). Because the Takings Clause "provides an explicit textual source of constitutional protection" against the type of conduct challenged by the Patels, that clause preempts the Patels' substantive due process claim. *Graham,* 490 U.S. at 395, 109 S.Ct. at 1871; *Armendariz,* 75 F.3d at 1324.[7]

■ The Patels did plead a takings claim under the Fifth and Fourteenth Amendments in their original and First Amended Complaints. The district court dismissed that claim as unripe under the doctrine of *Williamson County.*[8] In the Second Amended Complaint, the Patels pled as part of their § 1983 claim for violations of substantive due process that the City "acted with the motive and intent of depressing the property value in order that the City would eventually 'acquire' the property, either directly or indirectly, for other, possibly commercial, purpose [sic]." This allegation was not in the context of a takings claim, only substantive due process. In *Armendariz,* the court noted that because the plaintiffs in that case were alleging that their property had been taken by the City for a private purpose, the plaintiffs there "would not need to seek compensation in state proceedings before filing a

federal takings claim under the rule of *Williamson County.*" 75 F.3d at 1220–21 n. 5. However, the Patels did not make such an allegation in their First Amended Complaint and, in any case, have not appealed the dismissal of that complaint on ripeness grounds.

Because the Patels' substantive-due-process claim is preempted under *Graham* by the Takings Clause, we affirm the district court's grant of summary judgment on this claim.

### B. Equal Protection

The Patels argue that the City violated their right to equal protection of the laws by selectively enforcing the building code against them so as to prevent the reopening of the motel.

■ When a government's action does not involve a suspect classification or implicate a fundamental right, it will survive constitutional scrutiny for an equal protection violation as long as it bears a rational relation to a legitimate state interest. *New Orleans v. Dukes,* 427 U.S. 297, 303–04, 96 S.Ct. 2513, 2516–17, 49 L.Ed.2d 511 (1976); *Lockary v. Kayfetz,* 917 F.2d 1150, 1155 (9th Cir.1990).

■ As an initial matter, it is entirely unclear what distinction the City has allegedly drawn that the Patels are challenging. Their complaint alleges a denial of equal protection "in that the action directed at [the Patels] were not directed at or carried out in a similar fashion as to other similarly situated residential properties in other areas of the City." This allegation might be read to challenge an alleged distinction between motels in downtown San Bernardino and those in other areas of the city. However, the district court found in December 1992, in ruling on an earlier summary judgment motion by

7. The *Armendariz* court found the plaintiffs' substantive due process claim in that case preempted by both the Fourth and Fifth Amendments. 75 F.3d at 1318. Because the Patels' substantive due process claim is clearly preempted by the Fifth Amendment, we do not analyze whether the Fourth Amendment might also preempt their substantive due process claim.

8. As this court has described it, *Williamson County*

established two prerequisites to the maintenance of a federal claim for taking. The first is that the state action alleged to constitute the taking must be a final action.... The second ... is that a plaintiff must seek compensation through the procedures the state has provided before a claim of taking is ripe.

*Schnuck v. City of Santa Monica,* 935 F.2d 171, 173 (9th Cir.1991).

the City, that the City "devised and implemented a program systematically to inspect all motels in the city." The Patels have not challenged this order on appeal and in fact appear to have conceded that finding in arguing their opposition to the City's summary judgment motion on the equal-protection and due-process claims, in which they describe the City's action as taken "pursuant to a policy and program ... devised and implemented in 1990 to systematically inspect all motels, including Plaintiffs'." The Patels have offered no evidence to create a genuine issue of material fact that this inspection program was carried out only in downtown San Bernardino. We do not suggest that such a program so limited necessarily would have violated Patel's equal protection rights. In any event on this record the inspections that led to the closure could not have violated the Patels' rights, since similarly situated property owners—those who owned motels within San Bernardino's boundaries—were inspected.

As to the closure of the motel, the Patels have not raised a genuine issue of material fact sufficient to survive summary judgment. The only relevant evidence put forward by the Patels is Penman's newspaper article and Daniel's memo inquiring as to the status of proceedings to revoke the Conditional Use Permits of closed downtown motels. That memo lists five motels (including the Patels') closed between 15 June and 10 October 1990, thus making it clear that the Patels were not singled out for closure. To the extent that the Patels mean to argue that only motels located downtown, rather than in other areas of the city, were closed, however, they have offered no evidence whatsoever to suggest that non-downtown motels with code violations similar to theirs were not closed. Even if such evidence were material, none has been adduced. The Patels have failed to create a genuine issue of material fact that the closure of the downtown motels was City action based on an irrational distinction and thus violative of equal protection.

As to the inability of the Patels to obtain permits to remedy the code violations at the motel, the Patels have also failed to raise a genuine issue of material fact as to an equal-protection violation. The Penman article and the Daniel memo do raise serious questions and suggest that what was really at stake was not merely forcing the motels to comply with all applicable city health and safety codes but rather eliminating them entirely. If the City was in fact using its code enforcement process not to enforce compliance with the codes but rather to drive the downtown motels out of business, then the code-enforcement rationale that the City offers to justify its action would be the type of pretextual rationale that this court's equal-protection decisions forbid. See Armendariz, 75 F.3d at 1327 (where plaintiffs alleged City targeted them for code enforcement in order to obtain their properties at reduced value so as to replace low-income housing with commercial development, they "raised a triable issue of fact as to whether the [City's] asserted rationale of directing efforts to enforce the housing code at high-crime areas was merely a pretext"); Lockary, 917 F.2d at 1155–56 (plaintiffs stated equal-protection claim by raising triable issues of fact as to whether water shortage asserted as rationale for denying water hookups was pretextual). The Patels, however, have made far less of a showing as to a genuine issue of material fact on the question of pretext than did the plaintiffs in Armendariz and Lockary. See Armendariz, 75 F.3d at 1327 (affidavit by commercial developer detailing meetings with city officials to plan commercial development to replace plaintiffs' buildings, stating that officials asked him to purchase properties as a "strawman," recounting discussions on how to suppress value of plaintiffs' properties, and stating that he gave officials a list of properties to be considered; evidence that when code-enforcement sweeps began, 33 of 35 buildings targeted had been on developer's list); Lockary, 917 F.2d at 1155–56 (affidavits showing that, following imposition of moratorium on new water hookups due to alleged water shortage, local water consumption had risen by 70%, water storage capacity had risen by 1100%, utility had provided water for secondary units and swimming pools, utility had voluntarily relinquished rights to certain water sources, utility had leakage rate double that of accepted norms,

and utility had sufficient water to permit population growth).

Furthermore, the Patels have offered absolutely no evidence that they were treated differently from others who were similarly situated. There is no evidence that other motel owners whose buildings were summarily abated (either downtown or elsewhere in the city) applied for and were granted permits to carry out repairs, nor is there any evidence of owners of other residential properties that had been summarily abated applying for and receiving such permits.

Thus, the Patels failed to raise a genuine issue of material fact as to their claim of an equal protection violation and we therefore affirm the district court's grant of summary judgment.

## II. Dismissal of Claim for Inverse Condemnation

■ A district court's decision whether to exercise supplemental jurisdiction is reviewed for an abuse of discretion. *O'Connor v. State of Nevada*, 27 F.3d 357, 362 (9th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1367, 131 L.Ed.2d 223 (1995).

Under 28 U.S.C. § 1367(a), a federal court has supplemental jurisdiction over claims "that are so related to claims in the action within [the district court's] original jurisdiction that they form part of the same case or controversy under Article III." Under 28 U.S.C. § 1367(c), a district court may decline to exercise supplemental jurisdiction over a claim if (1) the claim raises novel or complex state-law issues; (2) the claim "substantially predominates" over the court's original-jurisdiction claims; (3) the court has dismissed all the original-jurisdiction claims; or (4) in "exceptional circumstances" if there are "other compelling reasons" to decline.

■ The district court declined to exercise supplemental jurisdiction over the Patels' inverse-condemnation claim only after it granted summary judgment to all individual defendants on the § 1983 claim and to all defendants on the Fair Housing Act claim. In exercising its discretion, the court stated:

I do that for this reason: The only federal claim remaining here is a *Monell* claim, by necessity a *Monell* claim, against the City under Section 1983. The State claim in inverse [condemnation] is based on the California Constitution. The thrust of the claim and what must be proved is that there is a public use taking, using a substantial factor test. There is a lot of different evidence; there's a lot of different theories. There, indeed is even a trier of fact, depending on which issue you're talking about, and I've come to the conclusion that it is the sort of thing that 1367 is designed to eliminate.

The court noted that the decision was not a casual one or made out of a desire to avoid work.

The Patels argue that the district court's reasoning does not satisfy any of the statutory criteria of § 1367(c). However, the district court appears to have decided that the state-law claim for inverse condemnation substantially predominated over the § 1983 claim against the City for due process and equal protection violations, a permissible ground for declining supplemental jurisdiction under § 1367(c)(2). This decision was not an abuse of discretion. Indeed, given that the district court subsequently granted summary judgment on the Patels' substantive due process and equal protection claims, and that the Patels themselves abandoned their pre-closure procedural due process claim, the district court's decision appears to have been well justified. The claim that was actually finally tried—an alleged violation of post-closure procedural due process—would be a slender federal reed on which to base jurisdiction over a state-law claim as substantial as inverse condemnation.

The Patels also argue that they were prejudiced by the district court's decision on December 3, 1992 to decline to exercise supplemental jurisdiction because the inverse-condemnation claim had been part of the joint pre-trial conference order of May 1992, and because trial was scheduled to begin on December 15, 1992. However, the district court recognized that its early-December decisions substantially changed the nature of the case. Therefore, at the same time that it dismissed the inverse-condemnation claim, it calendared a new pretrial conference date for

March 1, 1993 and directed the parties to prepare "a new order and a new witness list and all that." It also directed that any remaining motion practice occur before that date. Given that the trial did not actually commence until over two years after the district court's decision to decline supplemental jurisdiction over the state-law claim, the Patels do not have any real argument that they were prejudiced by that decision.

We affirm the district court's decision to decline to exercise supplemental jurisdiction.

### Alleged Trial Errors

#### I. Sufficiency of the Evidence

The Patels challenge the sufficiency of the evidence to support the jury verdict for the City on the Patels' claim of violation of their procedural due process rights. The City argues that the Patels have not preserved this issue for review because they failed to move for judgment as a matter of law at the close of all the evidence as required by Federal Rule of Civil Procedure 50(b).

The Patels did move for judgment as a matter of law at the end of the City's "reopening" statement, but that motion was denied and never renewed. This court has held that failure to comply with Rule 50(b) precludes a challenge to the sufficiency of the evidence on appeal, *Farley Transportation Co., Inc. v. Santa Fe Trail Transportation Co.*, 786 F.2d 1342, 1345–47 (9th Cir.1985), and that "the requirement that the motion be made at the close of all the evidence is to be strictly observed," *id.* at 1346.[9]

In their reply brief, the Patels argue that an exception is made where there is no new evidence presented (or the evidence presented is very brief) after the motion is made, and thus, no one is misled or prejudiced by a formal failure to renew the motion.[10] The only authority cited for this proposition is a 1989 District of Nebraska decision. We need not decide whether this exception exists because it does not apply here. After the Patels' motion was denied, they called six witnesses, each of whom was subjected to both direct and cross examination, and read into evidence the prior testimony of one witness; this presentation of evidence occupies nearly 70 transcript pages. After the plaintiffs rested their case, the City read into evidence deposition testimony by one witness and recalled one of the Patels' witnesses, who was again subjected to both direct and cross examination.

The Patels' appeal does come within another "limited exception to the rule against review of the sufficiency of the evidence in the absence of a motion for a directed verdict: where there is 'plain error apparent on the face of the record that, if not noticed, would result in a manifest miscarriage of justice'." *United States v. 33.5 Acres of Land*, 789 F.2d 1396, 1400 (quoting Charles Alan Wright & Arthur R. Miller, 9 *Federal Practice and Procedure* § 2536 at 593 (1971)) (9th Cir.1980). This exception, however, permits only " 'extraordinarily deferential' " review that is " 'limited to whether there was *any* evidence to support the jury's verdict, irrespective of its sufficiency'." *Benigni v. City of Hemet*, 879 F.2d 473, 476 (9th Cir. 1988) (emphasis added) (quoting *Herrington v. Sonoma County*, 834 F.2d 1488, 1500–01 (9th Cir.1987), *cert. denied*, 489 U.S. 1090, 109 S.Ct. 1557, 103 L.Ed.2d 860 (1989)).

No evidence whatsoever was presented to the jury to prove that the Patels were given notice and an opportunity to be heard after the closure of the motel. The

---

9. Rule 50(b) has been amended since *Farley* was decided, but the amendments do not appear to have changed the Rule as it applies in this situation. The first sentence still speaks of not granting a motion "made at the close of all the evidence" and the second sentence now speaks of the "movant" rather than of the "party who has moved for a directed verdict". *Compare* Fed. R.Civ.P. 50(b) *with Farley*, 786 F.2d at 1345 (quoting earlier version of Rule 50(b)).

10. The Patels do not argue that their case falls into the exception for cases in which the judge takes the earlier motion for a directed verdict under advisement rather than deciding it. *Farley*, 786 F.2d at 1346. Nor do they argue that the somewhat liberal construction of what constitutes a motion at the close of evidence applies here. *Id.* at 1347 (giving as examples a request for jury instruction directing verdict, an objection to a jury instruction on the ground of insufficient evidence, or "inartfully made or ambiguously stated" motions).

only evidence introduced supports exactly the opposite. Williams testified that he signed the October 29 letter notifying the Patels of the hearing scheduled for December 7, that he then gave the letter to his office's clerical staff, but that he did not know if the letter was mailed to the Patels or received by them. He did not testify as to whether the letter would have been mailed in the ordinary course of business. Daniel was questioned as to the mailing of various notices but was not questioned about the October 29 letter giving notice of the December 7 meeting. Mr. Patel testified at trial that he never received the October 29 letter notifying him of the hearing scheduled for December 7, and the City did not introduce the statement to the contrary in his prior sworn deposition to impeach that testimony. While the City did introduce Mr. Patel's declaration as evidence that he received the September 4, 1990 abatement notice and the September 26, 1990 correction notice, those notices did not apprise Mr. Patel of his right to be heard to contest the permanent closure of the motel; at the most, they notified Mr. Patel of his right to protest the City's determination that code violations existed at the motel. Thus, the jury was presented with no evidence from which they could have found that Mr. Patel received notice of the December 7 hearing from the City. Nor was there any opportunity to be heard on December 7, even if the Patels had been sent the letter. On December 7, the date scheduled for the post-closure hearing, the few Board members present immediately cancelled the Board meeting because they lacked a quorum. It therefore appears that there was no evidence to support the jury's verdict for the City and the judgment on the jury verdict must be reversed on this ground.

## II. Denial of Motion for Directed Verdict

 The Patels also appeal the district court's denial of their motion for directed verdict at the close of the "re-opening" statements. We have held that where a party "fail[s] to move for judgment notwithstanding the verdict ... [the court] will not pass

on the question whether a directed verdict was mandated by the evidence." *Kopczynski v. The Jacqueline,* 742 F.2d 555, 560 (9th Cir.1984), *cert. denied,* 471 U.S. 1136, 105 S.Ct. 2677, 86 L.Ed.2d 696 (1985). Because the Patels did not move for judgment as a matter of law after the jury's verdict against them, they have not preserved for appeal the question of whether the district court's denial of their motion for judgment as a matter of law at the close of "re-opening" statements was proper.

## III. Designation of Mayor as Policymaker in Jury Instructions

 The Patels assert that the district court erred in instructing the jury that W.R. Holcomb, the City's mayor at the time of the motel closure, was the official whose acts constituted final official policy of the City in respect to the giving of notice of post-closure proceedings. They argue that all of their evidence had focused on Penman, the elected city attorney, as the official policymaker. The identification of the official whose decisions constitute final policy is a question of law for the judge to decide before submission of the case to the jury. *Jett v. Dallas Independent School District,* 491 U.S. 701, 737, 109 S.Ct. 2702, 2723–24, 105 L.Ed.2d 598 (1989).

The City argues that the Patels failed to preserve this issue for appeal by not objecting to the instruction on the record at trial. Federal Rule of Civil Procedure 51 states that "[n]o party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection."

The Patels submitted a proposed jury instruction on municipal liability. They left a blank for the insertion of the name of the decision maker. This was appropriate in that the court is to make that decision and instruct the jury as to who the decision maker is.[11] Once the matter is decided by the

11. In the proposed jury instructions they submitted to the court, the Patels included "Proposed

Instruction No. 10" on municipal liability, the second paragraph of which read as follows:

judge, there is nothing to object to in the instructions because, as we have noted, the issue is not one for the jury to decide. The judge has made that decision for them. What we must decide is whether the judge was right or wrong. We are inclined to remand to the district court for further consideration although it would be within our competence under *Jett* to consider the city code, charter, and other applicable state law, along with the evidence introduced at trial.

We have considerable doubt that the mayor was the decision maker in this matter. All of the evidence, what there was of it, pointed to the city attorney as the responsible person with the authority to act and ratify. Nothing in the record suggests that the mayor was involved in deciding when or whether to deviate from holding a statutorily mandated hearing or ratified the failure to hold one. However, we prefer that the district court decide the matter in the first instance with such materials before it as allow it to make an informed decision. At the end of the trial, when the district court considered how to fill in the blank in the Patels' proposed instruction, the Patels argued that Penman was the official policymaker while the City's counsel argued that the appropriate policymaker was the mayor. Neither counsel adequately assisted the court.[12]

### CONCLUSION

The district court's grant of summary judgment to the defendants on the Patels' substantive due process claim was proper because the Fifth Amendment preempts that claim. Summary judgment on the Patels' equal protection claim was proper because the Patels did not raise a genuine issue of material fact that the City acted pursuant to an irrational distinction. The district court did not abuse its discretion in declining to exercise supplemental jurisdiction over the Patels' state-law claim for inverse condemnation. The Patels failed to preserve for appellate review the questions of the propriety of the district court's denial of their motion for judgment as a matter of law at the end of the City's "re-opening" statement. We therefore affirm the district court on each of those issues. However, the evidence presented to the jury did not support its verdict for the City, since there was no evidence from which the jury could find that Mr. Patel received notice of his right to be heard at the December 7 meeting of the Board of Building Commissioners. Therefore, the judgment on the jury verdict must be reversed and the case remanded for further proceedings. Each party will bear its own costs on appeal.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

---

You are instructed that the _____ [was an official] [(were officials)] whose acts constitute final official policy of the City of San Bernardino. Therefore, if you find that the acts of the _____ deprived plaintiff of his constitutional rights, the City of San Bernardino may be liable for such deprivations.

12. In finalizing the instructions, the court and counsel had the following colloquy on the instruction:

THE COURT: Who is the final policy maker of the City of San Bernardino, Penman?

MR. WEISER [Patel's counsel]: I believe so, your Honor, and I believe also Penman, as elected City Attorney, and also the Code itself codified by the Mayor—

THE COURT: Well, we're talking about an official. Official means a person. His name is James Penman?

MR. SIMMONS [City's counsel]: Your Honor, I don't believe he's presented any evidence as to who the policy maker was.

MR. WEISER: Well—

THE COURT: Well, you don't—it's in your interest that it be as high in the line as it can be.

MR. SIMMONS: I would say the City Council makes the policy for the City of San Bernardino.

THE COURT: Of course it does, but the person who enforces it and has the final word on the policy is James Penman, isn't it?

MR. SIMMONS: Final word? I don't think so. I would say the Mayor.

THE COURT: Who's the Mayor?

MR. SIMMONS: John Minor.

THE COURT: M-i-n-o-r?

MR. SIMMONS: That time it was Mayor Holcomb.

THE COURT: What's his first name?

MR. SIMMONS: W.R. are the initials.

THE COURT: Okay we'll see you at 1:30.