*71 ORDER DENYING APPEAL
DAVID D. SHAW, Chief Judge.
This matter came before the Court upon an appeal by Petitioners of a September 5, 2014 final decision by the Grand Ronde Enrollment Committee (“Enrollment Committee”) to remove Petitioners from membership in the Confederated Tribes of the Grand Ronde Community of Oregon (“the Tribe” or “CTGR”).
*72 Oral arguments were heard on this matter on February 12, 2015. Petitioners appeared through its counsel, Cherese D. McLain. Respondents appeared through its counsel, Tribal Attorney Deneen Au-bertin Keller.

Introduction

The Petition is denied. The related analysis of the parties’ claims, defenses, and arguments are discussed further herein. However, prior to engaging in the analysis, the Court is compelled to comment that this judicial opinion speaks only to a legal proceeding and does not intend to unnecessarily comment on the personal issue of the Petitioners’ sense of self and personal identity.

Procedural Background

Petitioners have been members of the Tribe for several years, and all originally assumed to be based on lineal descent from Chief Tum-walth (also known as Chief Tumulth). Chief Tumulth is a leader of the Cascade Indians and a person of historical relevance to Tribal history. Petitioners claim descent from Chief Tu-multh through his daughter Isabel, the offspring of Chief Tumulth and his wife Wah-dei-gah. Record Ex. 49. Isabel had a daughter named Georgiana as her only child. Id. Georgiana was born at the home of her aunt Virginia Miller and lived there her entire life. Id. Virginia Miller lived in Washington, applied for membership with the Yakama tribe (currently the Yakama Nation) in 1909, and became a Ya-kama allottee. Id.; Record Ex. 46. Geor-giana also became a member of the Yaka-ma tribe. Record ex. 75.
The Treaty of Kalaupya, Etc., finalized on January 22, 1855 and ratified on March 3, 1855 (“Willamette Valley Treaty”) was one of several attempts by the United States government to address Western Oregon bands and tribes of Indians. Record Ex. 28. Chief Tumulth signed the Willamette Valley Treaty. Id. After Chief Tu-multh signed the Willamette Valley Treaty, several Cascade Indians relocated to the Grand Ronde Agency area and subsequently became members of the CTGR. Chief Tumulth did not subsequently move to either the Coast Reservation or the area which became the Grand Ronde Reservation. Record Ex. 34. This lack of relocation to the CTGR area, and the intertwined membership requirement of a “pseudo-residency element” form a material portion of the substantive part of this appeal.
In April of 1856, Chief Tumulth was wrongly executed along with several other Cascade Indians. Id. Immediately before his capture and execution, Chief Tumulth sent his wives and offspring down the Columbia River to Fort Vancouver, where they eventually made it to the White Salmon temporary reservation. Subsequently, most of Chief Tumulth’s family relocated to the Yakama Reservation and a minority of them relocated to the Warm Springs Reservation. Record Ex. 30.
By 1857, the United States attempted to establish two reservations for Western Oregon Indians—the Coast Reservation and the Grand Ronde Reservation. Record Ex. 35. Chief Tumulth and his family did not relocate to either of these Reservations. Record Ex. 34.
In 1936, the Tribe established a Constitution to govern in part the membership and related government (“1936 Constitution”). The 1936 Constitution provided that membership in the CTGR shall consist of all persons of Indian blood whose names appear on the official census rolls of the CTGR as of April 1, 1935 and all children born to any Tribal member who is a resident of the Confederated Tribes of Grand Ronde Community at the time of *73 the birth of said children. 1936 Constitution, Article III, Section I. In 1954, Congress officially terminated federal recognition of the Tribe. 25 U.S.C. § 691, eb seq. On April 6, 1956, a related final membership roll of the Tribe was published. 20 Fed.Reg. 3636 (April 6, 1956) (“Termination Roll”).
In 1983, Congress restored federal recognition to the CTGR. 25 U.S.C § 713 eb seq. (November 22, 1983) (“Restoration Act”). The Restoration Act defined membership in the Tribe on a conditional basis, and until the Tribe’s subsequent Constitution would control, as follows: (i) any living individual listed on the Termination Roll; or (ii) any living individual entitled to be on the membership roll on August 13, 1954 but not listed; or (iii) any living individual descended from (i) or (ii) and having at least one/fourth degree blood of members of the Tribe or who would have been eligible to be members under this provision. The Restoration Act further provided that after election of the Tribe’s governing body, the Tribe’s Constitution would control membership.
On June 22, 1984, the official Tribal membership roll pursuant to the Restoration Act was published. 49 Fed.Reg. 256888 (June 22, 1984) (“Restoration Roll”). On November 19,1984, the Tribe’s Constitution was adopted by Tribal voters, with an effective date of November 30, 1984. The effective date of the Tribe’s 1984 Constitution, and its role as the sole source of membership requirements for subsequent membership applicants, and the timing of Petitioners’ relevant ancestors’ membership applications, form a material part of the substance of this appeal.
The Tribe’s 1984 Constitution provided that in addition to other membership elements not relevant to this appeal, a person could only be eligible for membership if validly listed on the Restoration Roll, or possessing l/16th Indian blood and descending from a member of the CTGR. Constitution, Article V, Section 1. Further, and of critical importance to this appeal, descent from a Tribal member was defined to include descent from a person named on any roll or record of Grand Ronde members prepared by the Department of the Interior prior to the effective date of this Constitution. Id. Competing theories concerning what could or could not form a relevant “roll or record of Grand Ronde members prepared by the Department of the Interior prior to the effective date this Constitution” and in relation to the Willamette Valley Treaty captured much of the debate in this action.
Petitioner Clifford “Marley” Fite was the first member of Chief Tumulth and Petitioners’ family to become a member of the Tribe and achieved this status in 1996 at a moment in time after restoration of the Tribe’s federal recognition and after adoption and approval of the Tribe’s 1984 Constitution. Individual Record Exs. A, D, G. The Enrollment staff and Enrollment Committee found at that time that Clifford Fite had an “uncle” that was previously enrolled, and also that Clifford Fite was a descendant of a treaty signer. Individual Record Ex. G. In 1996, the Tribe’s enrollment standards did not provide for enrollment based on either descent from a treaty signer or on the basis of lateral verses lineal descent. Constitution, Article V. The remaining Petitioners subsequently entered applications for Tribal enrollment relying upon the membership status and enrollment information of Clifford Fite. Individual Record Ex. E.
In other forums, and in relation to off-Reservation rights, the Tribe has used a history with Chief Tumulth to advance its interests.
In 2013, an enrollment audit determined that members claiming descent from Chief *74 Tumulth did not have the relevant Constitutional membership requirement of descent from a lineal ancestor listed on any roll or record of Grand Ronde membership. Individual Record Ex. J; see also Constitution, Article V. Petitioners were subsequently notified in writing of this information [1] and that they had a right to a hearing. Individual Record Ex. N.
Hearings were held in December 2013 with the Enrollment Committee regarding Petitioners’ proposed disenrollment. Record Ex. 19. Petitioner Clifford Fite attended the December 2013 hearing by telephone, and also submitted written information to the Tribal Council and provided testimony from his sister in support of Petitioners. Record Exs. 133,143.
Information about Susan Tomolcha reviewed by the Enrollment Committee on the second remand from the Tribal Council included that Chief Tumulth’s wife Wah-dei-gah was listed on the 1886 Grand Ronde census roll under the name “Mrs. Thomas.” Record Exs. 148, 149. Petitioners advocated that Wah-dei-gah’s daughter Isabel (their great, great grandmother) also used the surname Thomas. Id. In its initial analysis of this allegation, the Enrollment Committee noted that the 1886 census roll showed a “Mrs. Thomas” living with her son Isaac, but they had no information indicating that Wah-dei-gah had a son named Isaac. Id. The Enrollment Committee gave Petitioners additional time to submit information establishing a connection to the Mrs. Thomas listed on the 1886 census roll and the son named Isaac. Id.
In August 2014, Petitioners provided the Enrollment Committed with an additional written submission proposing that Isaac was either Chief Tumulth’s oldest son or a slave adopted into the family. Record Ex. 150. Petitioners also requested, and received, additional time to collect information about Isaac and Mrs. Thomas. Id. In September 2014, Petitioners provided the Enrollment Committee with a written submission advocating that Isaac was a slave who paddled Isabel to safety when soldiers came looking for her father. Record Ex. 151.
During the Petitioners’ Enrollment Committee hearings and process, the head of the Enrollment Department was a sibling of a person on the Enrollment Committee. During the Petitioners administrative enrollment hearing process, and after the Petitioners had participated in several days of hearings before the Enrollment Committee and Tribal Council (with the last Tribal Council hearing resulting in a type of remand back to the Enrollment Committee) the Tribe passed a July 2, 2014 amendment to the Enrollment Ordinance. Record Exs. 138, 139, 140. The July 2, 2014 Enrollment Ordinance amendment removed the Tribal Council from the disenrollment administrative process, and mandated that the Enrollment Committee make a final administrative decision, rather than a recommendation, as the last administrative step prior to any judicial review. Id. Upon remand from the Tribal Council back to the Enrollment Committee for the second time, the Tribal Council instructed Petitioners that only written submissions would be accepted at the next Enrollment Committee deliberations. Record Ex. 160.
The Enrollment Committee consists of Tribal elders which do not hold themselves out as being formally law-trained through *75 successful graduation from an accredited law school, or licensed attorneys. No publicly available information and no written information was available to Petitioners on the process to be used at the Enrollment Committee or Tribal Council hearings in regards to (i) how traditional “evidence” (as this term would be used by lawyers in a judicial setting) could be presented; (ii) how witnesses could be compelled to testify (including witnesses that are employees of the Tribe); (iii) and the nature of any discovery rights or process. Notwithstanding the issues identified in (i)-(iii) above, the Tribe repeatedly informed Petitioners that they would be provided the opportunity to present information they wanted to the Enrollment Committee, and that the issue for consideration was the lack of a proper lineal descent/common ancestor eligible for membership in the Tribe. Petitioners presented a substantial amount of written and oral advocacy, and documentary evidence, throughout the Tribal administrative process.

Legal Analysis and Discussion

The Court’s role in this matter is limited to an analysis of whether the administrative decision below was arbitrary and capricious, and also if the decision violated the rights in the Tribal Constitution. Enrollment Ordinance, Section (d)(4)(H).[2]
Petitioners argue as a fundamental point of advocacy that the disenrollment action is unconstitutional. This argument relies on the claim that the Tribal Constitution provides only limited grounds for disen-rollment, these grounds are not applicable here, and the Petitioners have already met and been accepted into the Tribe for many years. Specifically, Petitioners advocate that the language of Tribal Const., Art. V, Section 5 stating that the reasons for loss of membership “shall be limited exclusively to failure to meet the requirements set forth for membership in this Constitution” cannot apply membership standards or material facts affecting qualification for membership that existed prior to a person becoming a member in the Tribe. In response, the Tribe advocates that the Constitution provides authority for correction of a member enrolled by error, the grounds for this authority apply to Petitioners, and a person cannot achieve a vested enrollment status if the enrollment is based on error. The Tribe further argues that it has the sovereign authority to make a policy choice to forego providing conditional steps to allow correction or repair of a prior enrollment error.
Implicit in this debate between the parties is the scope and extent of the following questions: (i) what a lawful “correction” of an “enrollment error” can be in comparison to an unauthorized disenrollment action; and (ii), the degree with which the Tribe could take perceived conflicting positions in its administrative enrollment process on the same individual’s enrollment.
As a general matter, linguistic tension between “an action to correct a prior enrollment error” and “a disenrollment action” theoretically exists. And there may in time be a case before this Court where the facts stretch the linguistic tether of a claimed action to correct a prior enrollment error so far as to snap it from its Constitutional moorings. However, the actions below are reasonably viewed as correcting an error of the Petitioners common ancestors being ineligible at the time of enrollment at CTGR, and as such the *76 actions of the relevant Tribal parties are authorized by the Constitution and Tribal Ordinance. Upon similar grounds, the Tribal Ordinance is Constitutional, and the actions of the Tribal actors in relation to the Tribal Ordinance to process Petitioners for proposed disenrollment based on enrollment in error are legally authorized.
Petitioners next claim that an audit of enrollment files, conducted by a third party agent of the Tribe, is illegal. The results of this audit included the conclusion that Petitioners were not proper lineal descendants from an eligible Tribal member at the time of enrollment with the Tribe. This claim is denied. The Tribe is within its authority to both conduct an audit of enrollment files under its authority to correct errors and administer the Tribal enrollment standards, and also to hire agents and representatives to act on its behalf to perform these governmental functions.
Petitioners also claim that the disenrollment action is unauthorized pursuant to the equitable doctrine of laches. In general, laches acts as an equitable defense, due to the passage of time and unreasonable prejudice to the non-moving party, to an equitable claim brought against it by the moving party. The relief from a successful defense of laches is thus usually limited to equitable relief (e.g. an injunction) rather than legal relief (e.g. damages). This argument fails for three reasons. First, the narrow waiver of sovereign immunity provided for a judicial review of an enrollment appeal does not include explicit language permitting a defense of laches. Second, the respondent’s status as a Tribal government provides it with a shield from a defense of laches under the longstanding legal principal that a government should not be bound by lach-es when enforcing its rights. Here, the Tribe is enforcing its rights to both administer and apply the Tribal enrollment standards and to correct any enrollment error. See, United States v. Summerlin, 310 U.S. 414, 416, 60 S.Ct. 1019, 84 L.Ed. 1283 (1940); Chesapeake & Delaware Canal Co. v. United States, 250 U.S. 123, 125, 39 S.Ct. 407, 63 L.Ed. 889 (1919); Chevron, USA Inc. v. United States, 705 F.2d 1487, 1491 (9th Cir.1983); Utah Power & Light Co. v. United States, 243 U.S. 389, 409, 37 S.Ct. 387, 61 L.Ed. 791 (1917). Third, the CTGR action to remove Petitioners from membership is not an equitable claim.
On a related point to the doctrine of laches, Petitioners allege equitable es-toppel applies through the prior words and actions of the Tribal government in approving their Tribal membership. This claim also fails for two reasons. First, when the government is the party to which estoppel is asserted against, separate and stronger standards apply to the legal analysis. See, Kalk v. Mille Lacs Band of Ojibwe Corporate Comm’n, Case No. 03 APP 03, — Am. Tribal Law-,-, 2004 WL 5746060, at *3 (Mille Lacs Ct. App. Sept 16, 2004) citing Heckler v. Cmty. Health Services, 467 U.S. 51, 60,104 S.Ct. 2218, 81 L.Ed.2d 42 (1984). Second, when the government is the party to which equitable estoppel is claimed to apply, the government’s actions must rise beyond mere negligence, the government’s actions must constitute affirmative misconduct, and the imposition of estoppel must not harm the public interest. Purcell v. United States, 1 F.3d 932, 939 (9th Cir.1993) (citations omitted). Affirmative misconduct is defined as a deliberate lie or a pattern of false promises. Socop-Gonza-lez v. INS, 272 F.3d 1176, 1184 (9th Cir. 2001) (en bane). Affirmative misconduct is further defined as more than negligent conduct or misinformation. See, Sulit v. Schiltgen, 213 F.3d 449, 454 (9th Cir.2000); Keener v. E. Associated Coal Corp. 954 F.2d 209, 214 n. 6 (4th Cir.1992). Here, *77 the historical actions of the Tribal representatives in addressing Petitioners’ enrollment are most reasonably categorized as negligent conduct or misinformation.
Moving to the strongest arguments of Petitioners, the Court addresses first the claim that the decision below was arbitrary and capricious,' and then that the process used below violated the procedural and substantive due process rights guaranteed by the Tribal Constitution. These two arguments address first the factual basis for the decision below and then the process (and intent and means) used in reaching the decision.
This Court has held that a decision is arbitrary and capricious if it runs contrary to the evidence or is “so implausible that it could not be ascribed to a difference in view.” In the matter of Reyn Leno, 2 Am. Tribal Law 89, 95 (Grand Ronde Tribal Ct.2000){citing Motor Vehicle Mfrs. Ass’n v. State Farm, Mut. Auto. Ins. Co., 468 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)). Stated alternatively, there must be a rational connection between the facts and the decision made to insulate the decision from being arbitrary and capricious. See, Brandon v. Tribal Council for the Confederated Tribes of Grand Ronde, 18 ILR 6139, 6140 (1991).
Application of the arbitrary and capricious standard prohibits the Court from substituting its own decision for that of the decision-maker below. Instead, the Court is restricted to only determine if something exists in the administrative record that could rationally connect the facts to the decision. This is a steep barrier to overcome for any petitioner—and such a record exists here.
The Court begins the substantive analysis of the appeal with a discussion of the basis for the Enrollment Committee to determine that the Willamette Valley Treaty, signed by Chief Tumulth on behalf of the Cascade Indians, does not constitute a record or roll of Grand Ronde members. This is a question of fact and law subject to a de novo standard of review.
Petitioners advocate that Chief Tumulth both signed the Willamette Valley Treaty in an individual capacity (as opposed to solely as the representative leader of the group of Cascade Indians) and that this Treaty constitutes a record or roll of Grand Ronde membership. In support of this argument, the Petitioners rely upon the testimony of the Tribe’s former cultural officer Eirik Thorsgard. Mr. Thorsgard testified on repeated occasions, and was an ineffective witness due to apparent contradictions and ambiguities in his testimony. Record Ex. 19. Mr. Thorsgard appeared to also contradict himself in the testimony he first provided to the Enrollment Committee and then to the Tribal Council, on the question of how the Willamette Valley Treaty could or could not be a record or roll of Grand Ronde members, further harming his credibility and the weight of his testimony in either forum. Id; see also Record Ex. 133.
The Court finds that sufficient information exists in the administrative record below, and as evidenced by legal analysis and common history in Indian Country regarding the negotiation and execution of treaties with the U.S. government, that Chief Tumulth signed the Willamette Valley Treaty in a capacity as the leader of the represented band of Cascade Indians, and not acting as an individual. Further, and more importantly, the Willamette Valley Treaty relates to the creation of a still-to-be-determined reservation and future federally-recognized tribe (the CTGR Reservation and Tribe). Although many Cascade Indians did become members of the CTGR, and Chief Tumulth and his descendants were eligible to become members if *78 they so desired and relocated, there still existed a requirement for CTGR membership that the relevant individuals relocate to the future CTGR Reservation to qualify for CTGR membership. Chief Tumulth did not ever relocate to the future CTGR Reservation, and thus merely had eligibility for CTGR membership that was not effectuated. This is not an uncommon history in Indian Country and the Court is aware from public record and general knowledge of the existence of other federally-recognized tribes that consist of confederacies, have some members that descended from bands and band leaders that signed treaties with the U.S., and where membership in the federally-recognized tribe was only provided if the relevant descendants and leaders relocated to a new area or reservation.[3]
The Court next considers the substantive argument of Petitioners that they descend from a “Mrs. Thomas” who is listed on the 1886 census roll with her son Isaac. The Court analyzes this argument as a question of fact under the substantial evidence standard.
The Committee found that the core of Petitioners’ advocacy on descent from “Mrs. Thomas” is (i) Chief Tumulth’s daughter, Isabel, was known to use the surname Thomas; (ii) the age of Mrs. Thomas on the 1866 census matches with their theory of descent and familial relationship; and (iii) there is no information about a son named Isaac but he may have been a slave or adopted son of Mrs. Thomas. Petitioners also candidly admit that they do not know that Mrs. Thomas is Wah-dei-gah (the wife of Chief Tumulth and mother of Isabel). The Enrollment Committee found that there was no evidence either directly pointing to Mrs. Thomas and Wah-dei-gah being the same person or even that Wah-dei-gah came to Grand Ronde or had any connection to Grand Ronde after her husband’s death. The Enrollment Committee thus concluded that too much uncertainty existed as to the identity of Mrs. Thomas for Petitioners to meet the burden to prevent disenrollment for lack of a proper lineal descent, and the Court agrees that substantial evidence supports leaving this finding undisturbed.
Turning to the procedural challenges raised by Petitioners, it is uncontro-verted that the process used below fell short of a full judicial hearing, perceived imperfections occurred, and Petitioners had to overcome some obstacles to making its presentation. However, these issues do not in and of themselves constitute a failure to provide the minimum due process obligations mandated by Tribal law. Tribal Constitution, Article III, Section 3(k).
State and federal courts have long recognized that due process under the Indian Civil Rights Act (“ICRA”) is interpreted and applied with “due regard for the historical, governmental and cultural values of an Indian tribe,” and this concept is “not always given the same meaning as they have [it has] ... under the United States Constitution.” Tom v. Sutton, 633 F.2d 1101, 1106 n. 5 (9th Cir.1976); see also, McCurdy v. Steele, 353 F.Supp. 629 (D.Utah 1973). Thus, these same non-tribal courts recognize and uphold a reluctance to apply the due process requirements of ICRA in a manner that would “significantly impair a tribal practice or alter a custom firmly embedded in Indian culture.” Howlett v. Salish and Kootenai Tribes, 529 F.2d 233, 238 (9th Cir.1976) see also, Synowski v. Confederated Tribes of *79 Grand Ronde, 4 Am. Tribal Law 122 (Grand Ronde Tribal Ct.App.2003); Crowe v. Eastern Band of Cherokee Indians, Inc. 506 F.2d 1231 (4th Cir.1974); Wounded Head v. Tribal Council of Oglala Sioux Tribe of Pine Ridge Reservation, 507 F.2d 1079 (8th Cir.1975).
Due in part to a more robust experience and awareness of tribal culture and history, tribal courts generally show greater deference to Native values than a state or federal court.[4] As stated by the Colville Tribal Court of Appeals, “statutory due process under the Indian Civil Rights Act and Colville Tribal Civil Rights Act is not coextensive with constitutional due process ... Tribal values must always be the background to which those standards are applied.” Seymour v. Colville Confederated Tribes, AP 94-004 (3 CCAR 11) at n. 5. Due process requires, at its essence, notice and an opportunity to comment. Goss v. Lopez, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975). A determination that these requirements have been satisfied must be conducted in light of practical considerations. As noted by this Court, “interpretations and applications of the Due Process Clause are ‘intensely practical matters and the very nature of due process negates any concept of inflexible procedures.’ ” In the Matter of Reyn Leño, Co. C-99-10-001, Conf. Tribes of Grand Ronde Tribal Ct., 27 ILR 6213, 6215 (citing Goss v. Lopez at 738). Within the context of tribal governments, this “flexibility already inherent in due process generally, takes on greater meaning.” Id. at 6216.
With regard to notice, the Ninth Circuit has held that “[d]ue process only requires notice that gives sufficient detail to allow an opposing party to prepare his defense.” Barnes v. Healy, 980 F.2d 572, 579 (9th Cir.1992).
Here, the Tribe has exercised its sovereign discretion to establish an enrollment process where an initial identification of an error in a person’s membership status can be appealed to an Enrollment Committee of non-lawyer Tribal elders. No doubt should exist that Native culture involves the presence of the “talking circle” and its non-linear communication style and holistic approach to discussing and analyzing issues. This approach and form of analysis by its very nature differs from a nonNative analysis and approach. This approach also differs from a pure legal analysis of firmly designated and regimented standards for identifying issues, conduct ing pre-hearing formalized discovery of information from the opposing party, presenting information to the decision-maker, and conducting direct and cross-examination of “witnesses” or key individuals.
During the administrative process below, Petitioners were provided numerous opportunities to present information. Petitioners knew the reason why they were proposed for disenrollment, and the evi-dentiary basis for why the Tribe believed they did not descend from a lineal ancestor that was eligible for enrollment at the time of CTGR enrollment. Petitioners were not provided with a formalized process or standard for how Tribal representatives could be interviewed in advance or called as a witness. When considered in light of the totality of the process and mitigated measures of additional opportunities and extensions of time and the skill and the efforts of Petitioners, these perceived shortcomings to the process below did not rise to the level of legally fatal Tribal due process.
*80 Finally, Petitioners allege that the actions of the CTGR in removing them from membership violate their substantive due process rights and their related property (membership benefits such as housing, health care) and liberty interests (the identity and name as a Tribal member)in Tribal membership. However, a claim for a violation of substantive due process must allege (and then prove) governmental actions that “shock the conscience.” United States v. Salerno, 481 U.S. 739, 746, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). Stated otherwise, Petitioners must show that the Tribal action at issue was “clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare.” Euclid v. Ambler Realty Co., 272 U.S. 365, 395, 47 S.Ct. 114, 71 L.Ed. 303 (1926); Patel v. Penman, 103 F.3d 868, 874 (9th Cir.1996), overruled on other grounds by Nitco Holding Corp. v. Boujikian, 491 F.3d 1086, 1089 (9th Cir.2007).
The “shock the conscience” standard of substantive due process claims is thus a relatively high burden focusing primarily on both (i) intentional acts by governmental actors or a high level of reckless indifference and (ii) the government improperly using its power as an instrument of oppression. The standard for a substantive due process claim is higher than the standard for mere tort liability. Traditional fact patterns supporting such a claim include an abuse of prisoners or involuntarily pumping the stomach of an individual to find drugs used to charge the same person with a crime. See, County of Sacramento v. Lewis, 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998)(finding a lack of a sufficient shock of conscience in a police officer’s role in a high speed chase and subsequent death). An allegation that Tribal governmental actors proposed Petitioners for disenrollment due to an audit that alleged that Petitioners did not have proper lineal descent, and then conducted administrative hearings as referenced herein, may arguably appear negligent or even strongly disagreeable to Petitioners but based on the current record does not rise to the level of an intentional or recklessly indifferent act intended to harm the Petitioners with no sufficient relation to the public health, safety, morals, or general welfare.
Under the totality of these facts and context, procedural and substantive due process has been met.
For the reasons stated herein, the appeal is DENIED.

. Relevant text of the letter does not include reference to Chief Tumulth, but does state a lack of lineal descent from a relevant roll or record of Grand Ronde membership prepared by the Department of Interior prior to the effective date of the Tribal Constitution.

. On July 2, 2014, the Tribal Council amended the Enrollment Ordinance but in so doing limited the application of the amendments to factual settings where either the Enrollment Committee or Tribal Council had failed to take action on a proposed disenrollment prior to July 2, 2014. See, Enrollment Ordinance, Section (i)(7).

. The history of the Yakama Nation and the Confederated Tribes of the Colville Indian Reservation, as reflected through the relevant Indian Claims Commission cases and the U.S. v. Oregon Columbia River adjudication and management illustrate this point.

. This lawsuit involves only Tribal members and Tribal government bodies as parties and concerns the interpretation of the sovereign right of a tribe to determine its own membership.